CARLYLE ET AL. v. STATE HIGHWAY COMMISSION.

(Filed 12 January, 1927.)

**1. Roads and Highways—State Highway Commission—Statutes—Discretionary Powers—Reservation of Powers—Location of Highways—County Seats.**

The large discretion given by the Legislature to the State Highway Commission was limited by the express words of the statute to exclude the relocation of public highways connecting the various counties of the State, disconnecting them or making any change, alteration or discontinuance when such would exclude county seats existing along the highways, or the principal towns located along the route.

**2. Same—Mandatory Statutes—Discretion.**

The requirement of the statute that the public system of highways under the control of the State Highway Commission must "run to" and "connect" with county seats, is mandatory, withdrawing from its large discretionary powers that of relocating one of these roads contrary to this statutory provision.

**3. Same—Exercise of Discretionary Powers—Final—Statutes.**

Where the State Highway Commission has complied with the formalities prescribed by the statute with regard to a highway leading into and from a county seat, and has accordingly designated the existing roads as appeared upon the map, as a part of the plan adopted, and according to the terms of the statute has posted the map it has made at the courthouse door in the proper county, and has thereafter continued to so use the roads designated and by its conduct and acts has thus maintained them, its act in so doing is a final determination of the fact that the roads so adopted are the most practical routes within the meaning of the statute, and the exercise thereafter of any discretion in making radical or substantial changes in the location is ineffectual.

**4. Same—Maps.**

When the Highway Commission has mapped, adopted, selected, established and maintained an existing highway as the sole, separate and independent line connecting two county seats, this is a location of the road by the commission, and no radical or substantial departure therefrom can be made.

**5. Statutes—Amendments—Interpretation—State Highway Commission.**

The amendment of the Legislature of 1921 to the laws of 1919, the latter of which referred to county seats and principal towns, etc., by the use of the words "most practicable route," applies to the connection of the State's highways with the National highways in adjoining states, and not to connecting the county seats, etc., in the manner required by the former act.

**6. Roads and Highways—State Highway Commission.**

A contract by a county to loan money to the State Highway Commission upon the agreement that the latter should establish and maintain a highway in its State system of roads, is ineffectual, *Johnson v. Highway Commission*, 192 N. C., 561, cited and applied.

**7. Same—Adoption of Highway Into System.**

Where by its final determination the State Highway Commission has adopted a highway as a part of the State's system of roads connecting two county seats of the State, it may not as a discretionary measure, change this route thirteen miles from one of them and consolidate it with another highway which enters the county seat in question, upon the ground that it would be a saving of expense to the State.

CLARKSON, J., concurring; STACY, C. J., and ADAMS, J., dissenting.

CIVIL ACTION before *Midyette, J.*, at Chambers, 7 September, 1926, from ROBESON.

This was an action for an injunction to restrain the defendant from the alleged termination of route No. 70 at Pates.

Affidavits were filed by all parties. J. L. Prevatt and some one hundred and fifty others were permitted, without objection, to intervene in the cause. The interveners filed a brief, but they asked the same relief as the plaintiff.

The trial judge found the facts, and, upon such findings, entered judgment in favor of the plaintiffs. The judgment and findings of fact are lengthy, but by reason of public importance of the case, they are set out in full as follows:

This cause coming on to be heard before his Honor, G. E. Midyette, judge presiding, at chambers at Lumberton, N. C., on 7 September, 1926, it being the return day of the temporary restraining order heretofore issued herein, and upon motion to continue said restraining order to the final hearing, and all parties being before the court and represented by counsel, and the court having considered the pleadings, affidavits and exhibits and having by consent made a personal inspection and view of the several highways involved in this controversy.

The court now from the pleadings, affidavits, exhibits and admissions of the parties finds the following facts:

1. The court allows an amendment to the complaint so as to allege that the individual plaintiffs are taxpayers of the county of Robeson and State of North Carolina as well as citizens of said county and State. Most of said individuals live along the route now designated by defendant as highway No. 70, being the route marked in red upon the map which is hereto attached, marked Exhibit "A" and made a part hereof. Some of said individuals live in Lumberton but own property near and affected by said highway.

2. Certain other citizens and taxpayers of Robeson County were allowed by the court to intervene and become parties to this action. These individuals live several miles north of present highway No. 70 and near or along the road which is contended by them to be the true

ROCKFISH CREEK
MCMILLIAN
ROSLIN
MCNATTS
GRAHAMS
LUMBER RIDGE
PARKTON
McMILLIAN
OAKLAND
CROSS ROAD
BLANCHARD
S & B. CO. R.R.
TARDYS
SHANNON
CONOLYS SIDING
PEARSALLS
REX
GILMORES SIDING
GRADE CROSSING
RED SPRINGS
DUNDEE
TOBERMORY
ST. PAUL
SMITHS
MARSH SWAMP
BENNERT
ROZIER
A.C.L. R.R.
WAKULLA
COVINGTON
ALFORDS
FLORAL COLLEGE
CROMARHE
WOODMORE
GRADE CROSSING
SOUTHERLAND
MAXTON
PATTERSON
ALMA
SANDY
SELLERS
BUIES
POWERS
HOWELLSVILLE
RED BANKS
GRADE CROSSING
PATES
PENBROKE
MOSS NECK
CHURCH SCHOOL
BEE GEE
McLEODS
LUMBER RIVER
LOWE
LUMBERTON
RAEMON
ELROD
TOLARS
ALLENTON
BELLAMY
COTTINGHAM
BRIDGE
BRUCE
PURVIS
CHURCH
SCHOOL
RAYNHAM
CHALENOR
POPE
YORKVILLE
BRACEY
McCORMICKS SIDING
ALFORDS SPRING
ROWLAND
McDONALDS
RINGSDALE
GEORGETOWN
REEDY BRANCH
FORD
FAIRMONT
GRADE XING
PROCLORVILLE
HAMER
ORRUM
BOARDMAN
SOUTH CAROLINA
LEGEND
U UNIMPROVED
D DIRT OR GRAVEL
T TOPSOIL
SC. SAND CLAY
G GRAVEL
M MACADAM
ST. SURFACE TREATED MACADAM
P PENETRATION MACADAM
B BRICK
C CONCRETE
A ASPHALTIC
FOR FEDERAL AID ROADS AFFIX "(FA)" AFTER SYMBOL, AS A(FA) T(FA) ETC
DELIA
BARNESVILLE
BARNESVILLE
LUMBER RIVER
FLOWERS
MARIETTA
HOLMES V.
PARKVILLE
B.L. CO. R.R.
ROADS SURVEYED BY R.H. ROCKWOOD ENGINEER
DATE OF SURVEY: FROM MARCH 31 TO APRIL 17, 1921
ROBESON COUNTY, N.C.

location of the road as fixed by the legislative map, this being the road marked upon the map, Exhibit "A," as the route contended for by the interveners.

3. There are three several routes involved in this controversy, all of which are shown upon the map, Exhibit "A" hereto, to wit, the route marked in yellow which is contended for by the defendant; the route marked in red which is contended for by the plaintiffs, and the route contended for by the interveners which is marked as such.

4. Chapter 2, Public Laws of 1921, and the map thereto attached, provides for a State highway connecting the town of Raeford, county seat of Hoke County, with Lumberton, county seat of Robeson County, and this highway is indicated as running through the town of Red Springs, in the county of Robeson. The defendant has heretofore constructed a State highway along a part of said route, to wit, that part between Raeford and Red Springs, and is now proposing to construct the balance between Red Springs and Lumberton, and the construction of this part of said highway has produced the present controversy.

5. Upon the organization of the defendant and ever since then, it has construed the route marked in red upon the map, Exhibit "A," hereto as the route laid down upon the legislative map of 1921, and ever since that time the defendant has kept up and maintained said highway along the red line, same being an integral part of State highway No. 70, and has always been marked and designated as such upon all maps issued by the defendant.

6. That prior to the institution of this action, the defendant proposed to abandon several miles of the route shown in red, being a part of the present State highway No. 70, and in lieu thereof to construct a highway from Philadelphus Church to a point near Pembroke, where it will connect the present hard surface highway No. 20, being the yellow route upon the map hereto attached, and were arranging to let the contract for the construction thereof, and would have let said contract had they not been stopped by the injunction issued herein.

7. That prior to the institution of this action, a contract was entered into between the board of commissioners of Robeson County and the defendant, State Highway Commission, a copy whereof is hereto attached, marked Exhibit "B," and made a part hereof.

8. Under this contract a hard surface road has already been built and completed from the South Carolina State line by way of Rowland to Lumberton, which highway intersects with highway No. 20, about three miles west of Lumberton; and the contract has been let for grading and surfacing a highway from Fairmont to Lumberton and work is now being done thereon and it is the purpose of the defendant to hard-surface said road in due course.

9. Acting under said contract, defendant proposes to abandon several miles of present State highway No. 70 (the red route) and to construct a highway from Philadelphus in a southerly direction to a point near the Indian school at Pembroke, this being the route shown in yellow upon the map hereto attached. At Pembroke said yellow route would connect with State highway No. 20, and persons coming to Lumberton would follow route No. 20 from Pembroke on into Lumberton, a distance of thirteen miles.

10. If the proposed road is constructed from Philadelphus to Pembroke along the yellow line as proposed by the defendant, it will lengthen the distance between Red Springs and Philadelphus and Lumberton by approximately three miles, but on account of the fact that highway No. 20 is already paved, the yellow route would be cheaper to construct than the red route, the difference in cost of construction being approximately $225,000.00.

11. If the proposed highway was constructed along the red route, the present line of route 70, it will intersect with highway No. 20 at a point about three miles west of Lumberton, and from that point into Lumberton routes 70 and 20 are identical, this part of the route being a natural stem from the location of the ground and the fact that the road for this distance runs near Lumber River and the swamp thereof, and for a distance of three miles of Lumberton present route No. 20 also serves route No. 70, and for that distance the two highways are the same; but when a point is reached about three miles west of Lumberton, the direct route to Red Springs and Raeford lies in one direction, whereas route No. 20 lies in a different direction, as is indicated upon the map hereto attached.

12. If the proposed highway is constructed along the yellow route as proposed by the defendant, State highway No. 70, instead of intersecting with highway No. 20 at a point three miles west of Lumberton and coming thence into Lumberton by a natural stem, will intersect State highway No. 20 at a point near Pembroke, which is thirteen miles from Lumberton, and all persons traveling between Lumberton and Raeford, Lumberton and Red Springs, or Lumberton and Philadelphus will have to travel via Pembroke and thus lengthen the distance to be traveled by approximately three miles.

13. According to the legislative intent, as contained in chapter 2, Public Laws of 1921, present route No. 70, the red route was intended to unite the town of Raeford, county seat of Hoke County, with Lumberton, county seat of Robeson County, and as shown by the map attached to said act, said road was to be constructed via the town of Red Springs. Defendant has already constructed a highway along that part of said route between Raeford and Red Springs, and is now preparing

to construct the balance of the highway from Red Springs to Lumberton, but now proposes to abandon several miles of said highway, present route No. 70, between Red Springs and Lumberton, and to construct a new highway along the yellow route shown upon said map.

14. If said highway is constructed along the yellow route as proposed by the defendant it will disconnect the towns of Raeford and Lumberton by thirteen miles, in that, instead of following the direct route as indicated on the legislative map of 1921, the proposed yellow route deflects sharply to the south from Philadelphus Church to Pembroke and there connects with highway No. 20, at a point thirteen miles from Lumberton.

15. That to allow the highway between Red Springs and Lumberton to be constructed along the yellow route would be to deprive the town of Lumberton of the service of a highway connecting it with Raeford as indicated upon the legislative map attached to chapter 2, Public Laws of 1921.

16. That to allow several miles of present route No. 70 to be abandoned and the highway to be deflected and diverted to a point several miles distant, as proposed by the yellow route, would deprive the citizens living along present route No. 70 or having property thereon of the rights and benefits conferred upon them under chapter 2, Public Laws of 1921.

17. That to allow the abandonment of several miles of the present route 70, the red route, and the construction of the yellow route, would be to deprive the town of Lumberton of the service of said highway, and would cause certain travel from Red Springs and Philadelphus and that section to be diverted from Lumberton to Pembroke, Maxton, Laurinburg and other points along highway No. 20.

Upon consideration of the foregoing facts the court is of opinion that the defendant is without power under chapter 2, Public Laws of 1921, and amendments thereto, to disconnect the county seats of Hoke and Robeson counties, as would be done by the construction of the route shown in yellow on the map from Philadelphus to Pembroke, and by abandoning several miles of the present highway No. 70, the red route, and the defendant is also without power to reduce the number of highways leading into the town of Lumberton from county seats of adjoining counties, and while the court does not undertake to control the location of State highways between county seats, principal towns and other termini named in the act of 1921, the court does have the power to prevent a disconnection of county seats and any abandonment of any such part of the route when such abandonment would work a disconnection of county seats.

It is, therefore, on motion of attorneys for plaintiffs, considered and adjudged that the defendant be, and it is hereby restrained and enjoined from letting a contract for the construction of the proposed highway along the yellow line, or from taking steps toward the construction thereof between Philadelphus and Lumberton via Pembroke, or from Philadelphus along the yellow line to a point in the vicinity of Pembroke, and this order shall apply to all persons acting under, by or for the said defendant, to wit, its agents, servants, employees and attorneys until the final hearing of this cause. And this cause is retained for further orders.

Referring to the fifth finding of fact, it was admitted by the defendant that, some time during the year 1921, it posted a map at the courthouse door in Robeson County, showing the routes the State Highway Commission proposed to take over, and that the route marked in red upon the map, Exhibit "A," was the route by which a connection was established between Lumberton and Red Springs, and that, thereafter, the defendant marked this route as a portion of Highway No. 70, and has since that time maintained it, and these facts constitute the basis for his Honor's finding.

The defendant admits that the location from Philadelphus Church to Pembroke contemplated by it is not in accordance with the legislative map. This Philadelphus-Pembroke location is evidenced by the yellow line on Exhibit "A."

That the words "natural stem," referred to in paragraphs eleven and twelve, do not indicate any route laid out by nature itself, but only refers to a flow of traffic over the route referred to as "a stem," and this flow of traffic uses this route because there is no other way yet constructed for it to use, and so far as the contour of the vicinity of Lumberton is involved it is approachable from any angle or direction with a highway.

*Varser, Lawrence, Proctor & McIntyre and McLean & Stacy for plaintiff.*

*T. A. McNeill, Frank McNeill, F. D. Hackett, Jr., and Lee & Lee for interveners.*

*Attorney-General Brummitt and Assistant Attorneys-General Ross and Nash for defendant.*

BROGDEN, J. The Road Act, for the purposes therein specified, provided for a State system of highways:

(a) "Running to all county seats and principal towns." (Sec. 2.)

(b) "Connecting the various county seats, principal towns and cities." (Sec. 3.)

(c) "Forbidding any change, alteration or discontinuance of any road so as to disconnect county seats, principal towns, etc." (Proviso, sec. 7.)

So that the law requires that all roads in the system, designated by the act, shall run to and connect the county seats. And in order that the county-seat-to-county-seat nature of the system shall be preserved, safeguarded and guaranteed, it was further provided that county seats should not be disconnected.

The record in this case presents two aspects of the same question, to wit:

Does a highway "run to" a county seat when it terminates at a point thirteen miles from its corporate limits? Does a highway "connect" a county seat when it lacks thirteen miles of touching it at all?

To ask these questions, nothing else appearing, is to answer them in the negative.

Therefore, the inevitable conclusion is, that if the road, as proposed by the defendant, does not "run to" and "connect" the county seats involved in the controversy, there has been no compliance with the express terms of the law. And, if the road, as proposed by the defendant, disconnects a county seat, then, this also, would violate the express terms of the statute.

Now the county seats involved are Raeford, in Hoke County, and Lumberton, in Robeson County. Between these two county seats is Red Springs, which is admittedly a principal town, or, at least, there is no controversy about that. The Road Act required that these two county seats and this principal town should be connected by a highway. In obedience to the command of the law, the defendant undertook to establish a connection between these two county seats by way of Red Springs, the principal town. There was a road already in existence and in use prior to the ratification of the Road Act and prior to the creation of the Highway Commission. This road ran to Lumberton from Raeford and Red Springs. The defendant, in compliance with section 7 of the Road Act, in the exercise of its discretion, proposed five roads to constitute "the roads in such county in the State system." In the exercise of its discretion, it went further. It designated or made these roads certain by making a map thereof and posting it at the courthouse door in Robeson County. The roads so mapped and designated by the defendant were as follows:

(a) From Elizabethtown, the county seat of Bladen, to Lumberton, entering Lumberton from the east.

(b) From Columbus County, entering Lumberton from the southeast.

(c) From Fayetteville, the county seat of Cumberland, to Lumberton, entering Lumberton from the north.

(d) From Laurinburg, the county seat of Scotland County, entering Lumberton from the west.

(e) From Raeford, in Hoke County, to Lumberton, entering Lumberton from the northwest.

Each of said roads was designated and mapped as a separate, distinct and independent road. No objection was made by the road-governing body "of either Hoke or Robeson County," or by the "street-governing body" of either Raeford, Red Springs or Lumberton. The law says: "In that case the said roads or streets, to which no objections are made, *shall be and constitute links or parts of the State Highway System.*" If objection had been made by the designated parties, the defendant, after giving notice, would have heard the whole matter. In such event, the law says: "And the decision of the State Highway Commission shall be final." But the matter did not stop here. The defendant, in the exercise of its discretion, not only proposed and mapped this road as a part of the State Highway System, but it accepted it, as it existed, by taking it over and assuming control of it, and by maintaining it for more than five years. It gave it a name and called it Route No. 70. Under these circumstances, Route No. 70 was established by the defendant as a separate, distinct and independent road, constituting the sole and only connection between the county seats of Raeford and Lumberton. By identically the same process No. 20 was established as a separate, distinct and independent road, constituting the sole and only connection between the county seats of Laurinburg and Lumberton. No. 20 has been paved without material "change, alteration or discontinuance" so far as this record discloses.

Hence, the trial judge finds, as follows: "Referring to the fifth finding of fact, it was admitted by the defendant that some time during the year 1921 it posted a map at the courthouse door in Robeson County, showing the routes the State Highway Commission proposed to take over, and that the route marked in red, upon the map Exhibit 'A,' was the route by which a connection was established between Lumberton and Red Springs, and that, thereafter the defendant marked this route as a portion of highway No. 70, and has since that time maintained it, and these facts constitute the basis for his Honor's findings. It (the defendant) has construed the route marked red upon the map Exhibit 'A' (hereto attached) as the route laid down upon the legislative map of 1921."

This finding by the trial judge settles four propositions:

(1) That route, marked in red Exhibit "A," contended for by the plaintiff, was a road actually in existence and use, and not a random line upon a map dipping in swamps or scaling mountains.

(2) The defendant, in the exercise of its sound discretion, proposed this road as a part or link of the State System.

(3) The defendant, in the further exercise of its sound discretion, mapped this road and posted the map at the courthouse door in Robeson County, thus giving notice to the world "of the roads that are to be selected and made a part of the State System of Highways."

(4) The defendant, in the exercise of its sound discretion, selected this road as the identical road, shown on the legislative map attached to and being a part of the Act of 1921.

Therefore, this road was proposed, designated, mapped, selected and established, by the defendant, in the exercise of its sound discretion, as the connecting link of the State Highway System between Raeford, Red Springs and Lumberton.

But, at this point the ways part asunder.

The defendant says in its answer "that subject to the limitations above referred to, the duty, obligation and authority is imposed upon the said defendant to change or relocate any existing roads to the end that the "most practicable routes will be finally established and constructed."

This proposition means that the essential requirement of the law is that the highway shall be built by the "most practicable routes." Who is to determine these practicable routes, the Legislature or the defendant? The defendant says it has the sole power to decide this question. Suppose the defendant should determine that none of the existing roads, designated in accordance with the formalities required by the statute, were "practicable routes," then, by such reasoning, it could construct and establish an entirely and totally new system of highways for the State. Therefore, it would inevitably follow that with the right to construe the law and thereupon create a new system of roads in accordance with such construction, the legislative and judicial functions of the State, with respect to roads, would disappear.

The Road Act of 1921 was an amendment to chapter 189 of the Public Laws of 1919. The Act of 1919 provided, "for the construction and maintenance of a system of State highways which shall be constructed so as to form a system of modern highways . . . connecting by the 'most practicable routes,' the various county seats and other principal towns of every county in the State." Thus, it will appear that in the Act of 1919, the words: "most practicable routes" referred directly to county seats and principal towns. But the Act of 1921 used the words "most practicable routes" in a totally different connection, as will appear by reference to section 2 of the act. There, the words "most practicable routes" occur in a clause as follows: "And linking up with State highways of adjoining states and with national high-

ways into national forest reserves by the most practicable routes." It is true the caption of the act uses the words "practicable routes" in connection with county seats and principal towns, but the caption of an act "cannot be used to extend or to restrain any positive provisions in the body of the act." *S. v. Patterson,* 134 N. C., 612; *Hadden v. Collector,* 72 U. S., 107. But, however, this may be, the Legislature declared that this road was a "practicable route" when it placed it on a map which was incorporated as a part of the statute. The defendant declared that it was a "practicable route" when it mapped this identical road and posted it at the courthouse door in Robeson County and notified the governing authorities of the county and of the town that this route was "to be selected and made a part of the State System of Highways." It is not to be assumed that the able and expert engineers of the defendant would have deliberately mapped and posted an existing road, and selected and accepted it, which they knew or had reason to believe was an "impracticable route." Upon the other hand, it is to be assumed that the defendant designated, mapped, selected, and assumed control and maintenance of it in good faith, and in the exercise of its sound judgment and discretion, as a "practicable route" between Raeford and Lumberton. It cannot be contended that the law required the defendant to assume control of this road within sixty days. Section 8 of the statute provides that the State Highway Commission within sixty days from the ratification of the act "shall commence to assume control of the various links of road constituting the State Highway System and shall complete the assumption of control . . . as rapidly as practicable." Hence the statute, very wisely, set no time limit as to the assumption of control, leaving this matter to the sound judgment and discretion of the Commission, in order that it might have full opportunity to investigate, among other questions, whether the route was "practicable" or not, or whether, if selected, the cost of paving would be reasonable, or whether the engineering features were favorable.

There is another phase of the statute which is the subject of conflicting contentions. It is contended that the words of the statute "shall be and constitute links or parts of the State Highway System," and the words "the decision of the State Highway Commission shall be final" should not be construed according to their strict and mandatory import, because road building is a technical problem and in the natural course of events, a trained body of experts and expert engineers would find many changes and alterations desirable and which would promote the efficiency of the system. The legal effect of this contention is that the word "tentative" should be read into the law. Thus, the legislative map should be deemed in all respects "tentative." The county map made and posted by the defendant should be construed in all respects "tentative." The

words "shall be and constitute links or parts of the State Highway System" should be read: "shall be and constitute tentative links or parts of the State Highway System." Also, that the words: "decision of the State Highway Commission shall be final" should be read: "decision of the State Highway Commission shall be tentative." Whether or not the word "tentative" should be read into the statute is a question open to debate. But as to whether the courts or the Legislature should put the word there is not open to debate. The function of the court is to construe laws and not to make them. If the courts attempt to read into the law words of their own or read out of the law other words contrary to their conception of what the law ought to be, then this would amount to erecting a legislative despotism of five men, which would perhaps be more pernicious and subversive of the State's peace than the judicial despotism mentioned by *Chief Justice Pearson* in *Brodnax v. Groom,* 64 N. C., p. 244.

In *School Comrs. v. Alderman,* 158 N. C., 191, *Justice Hoke* declares the following rule for construing statutes: "In other words, the statute must be interpreted literally. Even though the Court should be convinced that some other meaning was intended by the law-making power, and even though the literal interpretation should defeat the very purposes of the enactment, still the explicit declaration of the Legislature is the law, and the courts must not depart from it."

So, in our case, there are explicit declarations by the Legislature, and under the rule announced by *Justice Hoke* these explicit declarations are the law, irrespective of what the Court thinks as to their wisdom or unwisdom.

Of course changes, alterations and discontinuances of proposed roads shown on the legislative map were authorized under certain limitations, but when that map was actually fitted to the ground by the defendant through the map made by it and posted at the courthouse door, and by the exercise of its discretion in accepting, selecting and incorporating such road into the State system the explicit legislative declaration was "and the decision of the State Highway Commission shall be final."

*Justice Ruffin,* in *Pugh v. Grant,* 86 N. C., 47, in discussing the interpretation of statutes, says: "The true rule for construing a statute, and we may say the only honest rule, for a court really seeking to observe the will of the Legislature, is to consider and give effect to the natural import of the words used. If they be explicit, and express a clear, definite meaning, then that meaning is the one which should be adopted, and no effort should be made by going outside of the words used, to limit or enlarge its operation. Above all, it is not to be presumed that the Legislature intended any part of a statute to be inoperative and mere surplusage."

Did the Legislature intend that the map attached to the statute and incorporated as a part thereof should be "inoperative and mere surplusage"?

Did it intend that the words "shall be and constitute links or parts of the State Highway System" should "be inoperative and mere surplusage."

Did it intend that the "designation of all roads comprising the State Highway System as proposed by the State Highway Commission shall be mapped" was to "be inoperative and mere surplusage"?

The word "designation," according to its "natural import," has an established meaning. The definition given in Webster's International Dictionary is: "A pointing out or showing; indication. Selection or appointment for a purpose. That which designates; a distinguishing mark or name." This definition has been adopted and applied in *Kimball v. Salisbury,* 56 Pac., p. 975, and in *S. v. City of Red Lodge,* 83 Pac., 643.

Thus, the "designation of all roads," etc., and the subsequent acceptance and selection thereof was the method by which the statute required the defendant in the exercise of its discretion to point out, make known, designate and mark out the roads in each county which were to be "selected and made a part of the State System of Highways."

Now, if the word "tentative" can be read into the various clauses of the act, and the words "most practicable routes" can be construed to mean such routes as the defendant may from time to time determine, then the statute can be reduced to a simple minimum, to wit, that the State issued $50,000,000 in bonds and in due course turned over said funds to the defendant to establish and construct such a system of highways for the county seats and principal towns and by such connections as the Highway Commission may, in its discretion, deem wise and proper. The Court has nothing to do with the question as to whether the delegation of such discretion would be wise or unwise. With us, the only question is, did the Legislature, by the language employed, actually delegate such discretion? We think not.

We are, therefore, of the opinion that the statute means that when an existing highway has been designated, mapped, selected, established and accepted by the State Highway Commission as the sole and independent connection between two county seats in compliance with the formalities prescribed by the statute that this is a location of the road as a permanent link of the State System of Highways.

Now Raeford, Red Springs and Lumberton, having been "connected," both by the formalities prescribed by law and by the exercise of the discretion of the defendant in accepting and adopting this highway marked in red upon Exhibit "A," as the sole, separate and independent

link between the two county seats, we are of the opinion that any radical or substantial departure therefrom would constitute a disconnection.

Thus, in *Newton v. Highway Commission*, 192 N. C., p. 54, the Court held: "We conclude that the Road Act itself connected the county seats according to the best judgment of the Legislature. A substantial departure from such connection so made by the sovereign power of the State must, of necessity, constitute a disconnection."

The defendant, however, earnestly insists that the law ought not to be so declared for three reasons:

(1) That the road proposed by it "runs to" and "connects" Lumberton because it enters No. 20 at Pates, near Pembroke, and while this point is thirteen miles from Lumberton, still No. 20 runs from Laurinburg to Lumberton and is now a paved highway, and the public could travel from Raeford to Red Springs and from Red Springs to No. 20 at Pates, and thence enter Lumberton from the same direction and at the same point. We assume that there can be no serious contention but that No. 70, the route in controversy, by virtue of the proposed change, would terminate at Pates in No. 20. Now, if No. 70 can be terminated in No. 20, thirteen miles from the county seat, and yet "run to" and "connect" it, why could not the same result be achieved by terminating No. 70 fifteen miles distant, and, if fifteen miles, why not forty? A traveler from Raeford would still enter Lumberton from the same direction and at the same point. In the exercise of the same discretion, why could not the road be built from Red Springs or Raeford to enter No. 20 at Laurinburg and "run to" and "connect" Lumberton through Laurinburg. Even in this event, a traveler from Raeford or Red Springs would still enter Lumberton from the same direction and at the same point, and thus under the guise of changes, alterations and discontinuances, the entire system of highways could be consolidated into a few great thoroughfares. Evidently, the Legislature contemplated that Lumberton was entitled to these roads as independent entities. If the proposed termination of No. 70 at Pates should be allowed, this would reduce the number of roads designated by the statute, and also by the defendant. There would be a conflict between the judgment of the Legislature and the judgment of the defendant. We are of the opinion that the judgment of the Legislature should abide.

Obviously, a road can only connect points between its origin and its terminus. So far as this controversy is concerned the origin of the road is Raeford and the terminus, under the proposed change, would be Pates, near Pembroke, thirteen miles from the objective. Hence, Lumberton would not be on the route of the road at all. The law required that the highways in the State system should "run to" and "connect" the county seats at all events, and irrespective of any maps, proviso or discretion.

(2) The second reason urged in behalf of the defendant is that this Court has heretofore established the law to the contrary. This proposition requires an examination of the cases relating to the subject. There are three decisions bearing upon the construction of the Road Act, but only one of these decisions, to wit, the *Newton case,* undertook to deal with the question of connecting county seats, and the question involved in this appeal is the question of connecting county seats.

The first case decided by the Court was *Road Commission v. Highway Commission,* 185 N. C., p. 56. In that case the Highway Commission, on 2 May, 1921, mapped a road as required by the statute running from Tarboro to Halifax, two county seats, by way of Speed and Hobgood. The county authorities within sixty days signified their approval. Thereupon, on 1 September, 1921, a short time after the sixty days had expired, "the Highway Commission, having had a hearing to determine whether finally to approve the route between Scotland Neck and Tarboro, passing through Hobgood and Speed, abandoned the location of that part of the route between Moore's Crossing and Scotland Neck, substituting a shorter, and, as it adjudged, a better route." The Court held: "It was evidently the intent of the statute that the posting at the courthouse door was to give the State Highway Commission an opportunity to pass upon objections which might be raised against the proposed location by the local authorities and the restriction of 60 days in which such objection could be made was a restriction upon the local authorities only. It was not intended to take from the State Highway Commission the general discretionary authority conferred in section 7 to 'change, alter, add to, or discontinue' the roads shown on the map posted by the Highway Commission.

The action of the Highway Commission complained of consisted merely in shortening the road between Moore's Crossing and Scotland Neck (2 points on the road between Halifax and Tarboro). It does not appear that this was an abuse of the authority vested in the Highway Commission, and the court below properly refused to grant a mandamus to compel the Highway Commission to adhere to the first or tentative location of the road. Neither by length of time nor long use, nor by the allegation of any other fact does it appear that the Highway Commission exercised their discretionary power arbitrarily or abusively."

An analysis of this opinion discloses, therefore:

(a) That the action complained of was the mere shortening of a road between two county seats involving neither a connection nor a disconnection of either principal towns or county seats.

(b) That the Highway Commission did not accept the road as mapped or incorporate it into the State System of Highways, but ex-

pressly declined to do so promptly, and after a public hearing in Raleigh on 1 September, 1921. The statute provided that it could hear objections and render a decision, and provided further: "And the decision of the State Highway Commission shall be final."

In the case now before us the action complained of is not the mere shortening of a road between two objectives, fixed by law, but it is the termination of it and the destruction of its identity thirteen miles before it reaches its objective; and, further, in our case, the Highway Commission accepted the road in controversy, incorporated it into the State system, and has maintained it as such for more than five years.

Hence, the case of *Road Commission v. Highway Commission, supra,* is not decisive of the principle of law involved in the present appeal.

The next case, involving a construction of the Road Act, was *Cameron v. Highway Commission,* 188 N. C., p. 84. This case and the *Newton case* are the "apples of discord" in the road law. They both present an honest but fundamental divergence of opinion. The decision in the *Cameron case* was rendered by four *Justices,* the *Chief Justice* having been called to his reward before the case was decided. Three of the four *Justices* wrote opinions. The divergence of opinion and of interpretation of the statute are fully reflected in the decision. For instance, the main opinion says: "We do not controvert the proposition that the defendants are clothed with certain discretionary powers; but, as we interpret the act, these powers do not include changing, altering, or discontinuing all roads in the exercise of a discretion which can be reviewed only in case of oppression or bad faith." The concurring opinion says: "In my opinion, it must be determined by the State Highway Commission in the exercise of a sound discretion, subject to judicial review only in case of abuse of discretion or when the authority reposed in the Commission has been exercised in an arbitrary and unreasonable manner." Another concurring opinion says: "that the Legislature was not only not willing to confer such extended powers on the Commission, but they did not—they limited them in going from county-seat-to-county-seat, to go by principal towns."

These declarations of law, with respect to the discretion delegated by the statute to the defendant, are as far apart as the zenith and the nadir.

Again, the main opinion says: "To hold with the defendants that the right to determine what are principal towns is to be referred to the commission itself, and that their action is final, except in case of manifest abuse, would be the proper interpretation of the act if there had been no proviso."

A concurring opinion, discussing the identical proposition, says: "To my mind, principal towns, mentioned in the statute, and which may not

be disconnected from the State's System of Highways, are to be determined by the State Highway Commission in the exercise of a sound, but not arbitrary judgment."

Another concurring opinion says: "The towns on the map were the principal towns in the mind of the Legislature when the act was passed."

These declarations of law as to how a principal town could be identified and determined are also as far apart as the zenith and the nadir, and yet they are the utterances of three *Justices* out of four who participated in the Cameron decision. The *Cameron case* went off upon the point that Stem was not a principal town, and, therefore, it was not necessary to connect it by the highway running from Oxford to Durham. The record in the *Cameron case* discloses that it was alleged in that case and stressed at great length in the briefs that the road from Oxford to Durham had been mapped, and the map posted at the courthouse door; that no objection had been made by the governing authorities, and that the Highway Commission had thereupon taken the road over and maintained it for about three years. But the effect of posting the map at the courthouse door is not referred to in the opinion of the Court. The effect of the acceptance of the road and of the incorporation of it into the State System of Highways was not discussed or mentioned in the opinion. The effect of explicit legislative declarations "shall be and constitute links or parts of the State Highway System" and the "decision of the State Highway Commission shall be final," are not mentioned or discussed. It would appear that this is sufficient evidence of the fact that the Court left these matters open for future determination, for the reason that it was not necessary to pass upon them if Stem was not a principal town, because, in such event, there was no requirement that Stem should be connected at all with either the highway system or with Oxford and Durham, and if there was no requirement that Stem should be connected at all, there was certainly nothing in the statute to prohibit or prevent a disconnection. An interesting sidelight disclosed by the *Cameron case* is the statement of engineers of defendant, as follows: "It is, therefore, my opinion that the engineering factors favor the Stem route. The margin is not great, and other factors, such as local service, opening up a new section, and land values, which favor the Creedmoor route, should be balanced against the engineering features and the advisability of changing the State Highway from its present location on the Stem route." It was further stated in briefs of plaintiff that an error of approximately $20,000.00 had been made in the calculation of the estimated cost of the two routes with the result that the Creedmoor route, chosen by the defendant, was the more expensive construction. In other words, in the *Cameron case,* the defendant undertook to abandon the road even

though its engineering features were more favorable and the cost of construction less. At all events, however, the road was built to Durham and to Oxford, the county seats. There was no effort made to consolidate the road with some other highway or to terminate it thirteen miles from Durham.

As the writer interprets the *Cameron case,* there were three points upon which a majority of the Court agreed, to wit:

1. Stem was not a principal town in contemplation of the law.

2. The language of the proviso of section 7 was mandatory and not discretionary.

3. That the map attached to the legislative act could not "reasonably be accepted as a legislative fiat to construct a system of highways in strict conformity with the roads proposed."

These propositions are not decisive of the present case now under consideration. As to whether or not Stem was a principal town is immaterial to this appeal. It is agreed on all sides and in all the cases that the language of the proviso is mandatory, and it is not intended in this *Carlyle case* that the highway should be paved in "strict conformity" with the proposal shown on the legislative map but rather that when that map was fitted to the ground by the defendant with all the formalities prescribed by the statute, and thereupon an existing highway is selected, accepted and actually incorporated into the State system, that the period of "proposing" ended and the period of permanent links or parts of the State Highway System began.

The third case dealing with the construction of the statute was *Newton v. Highway Commission,* 192 N. C., p. 54. This case involved the nature of the connection of the highway system with the town of Newton. The connection through the town of Newton had been proposed, mapped, established, taken over, selected and designated as a part of route No. 10 in accordance with the formalities of the statute, and the Court held that the defendant was without power to make radical changes and departures from the connection so established.

(3) The last contention made in behalf of the defendant in objection to construing the statute as indicated herein, is that the statute delegates to the defendant certain discretion in the location of a road which is not reviewable by the Courts. The general rule is stated thus in *Newton v. School Committee,* 158 N. C., 187: "In numerous and repeated decisions the principle has been announced and sustained that courts may not interfere with the discretionary powers conferred on these local administrative boards for the public welfare unless their action is so clearly unreasonable as to amount to an oppression and manifest abuse of discretion." The *Newton case* grew out of the selection of a school site for a graded school in Charlotte. The case

of *Newton v. School Committee* was a companion case to *School Comrs. v. Aldermen,* 158 N. C., 191. The aldermen of Charlotte contended that they had the right to approve the selection of school sites rather than the board of education. The Court held that the power to purchase sites and "do everything that is necessary and proper to open and conduct" the schools was broad enough and ample enough to clothe the school committee with sole and exclusive authority to select sites, and that for that very reason the "board of aldermen of Charlotte are without discretion in the matter." There were no formalities prescribed by the statute as to proposed sites or other formalities prescribing how the proposed sites should become final.

The other case most frequently cited in support of the discretion rule is *Brodnax v. Groom,* 64 N. C., 244. That case involved the question as to what are the necessary expenses of a county. An act of the Legislature had been passed authorizing the commissioners of Rockingham County to levy and collect a special tax "for the purpose of building and repairing bridges in said county." The statute did not undertake to limit the discretion of the commissioners at all or to prescribe any formalities to be observed in the location of bridges, but left the whole proposition wide open. The Road Act of 1921 did not leave the whole proposition wide open, but prescribed the formalities by which the location of the road in controversy was to be determined by the defendant, and expressly declared that when those formalities were complied with in the selection and establishment of an existing highway as a connection between two county seats or principal towns that such selections should be and constitute "links or parts of the State System."

In the case now before us, no engineering difficulties or obstructions are alleged, and no reason given for abandoning the road, except that the defendant, in its discretion, desires to do so, because Robeson County loaned the defendant $1,000,000.00 under an agreement that route No. 22, from Lumberton to Rowland, should be built and a portion of route No. 70, from Lumberton to Fairmont, and that this sum is not sufficient to construct these roads, and also the road in controversy, according to the original plan, and, therefore, in order to come within the amount of the fund provided by Robeson County the defendant proposes to lop off a substantial portion of the road and consolidate it with No. 20. This Court has recently held in the case of *Johnson v. Highway Commission,* 192 N. C., p. 561, commonly known as the *Varina case,* that neither the defendant nor the County Commissioners of Robeson County had the legal right to enter into a contract as to the location of the road. The *Varina case* contains a full discussion of the principle and the propositions of law therein contained, and will not be commented on here.

We, therefore, hold, upon the facts as disclosed by this record:

1. That the defendant is without power to divert No. 70 and terminate it at Pates, thirteen miles from Lumberton, because it has been mapped, established, accepted and incorporated as it exists as a permanent link or part of the State Highway System.

2. That the road, as proposed, does not run to and connect Lumberton as contemplated by the statute, and this requirement was mandatory, and therefore excluded any exercise of discretion in that particular.

3. The Legislature has determined that the five independent roads referred to constitute the contemplated service to the county seats. The defendant, in compliance with the formalities prescribed by law, has accepted and incorporated these roads into the State System, and it has no power to diminish or reduce the service by destroying and consolidating a separate and independent link or connection by which that service is to be delivered to the county seat.

4. We hold further that the termination of the road at Pates, thirteen miles from Lumberton, would constitute a disconnection forbidden by the law.

Therefore, we conclude that the judgment should be

Affirmed.

CLARKSON, J., concurring: I concur in the able and logical opinion of *Mr. Associate Justice Brogden,* it may not be amiss to call attention to a few errors that the *Chief Justice* has fallen into in his dissenting opinion. He seems to indicate that in road building the Legislature by statute cannot control its agency, the Highway Commission, in the building of State highways. That instead of the Legislature, the lawmaking body, being supreme, the Highway Commission is the master and the Legislature the servant, when the clear language of the legislative instruction and command to the Highway Commission was as follows: "A map showing the proposed roads to constitute the State Highway System is hereto attached to this bill and made a part hereof. The roads so shown can be changed, altered, added to or discontinued by the State Highway Commission: *Provided, no roads shall be changed, altered or discontinued so as to disconnect county seats, principal towns, State or National parks or forest reserves, principal State institutions and highway systems of other states."* The Legislature, responsible to their constituents, took no chances. They had a map, naming the cities and towns on the map, and the roads are shown on the map going through these objectives, and that map was made a part of the act.

In the main opinion in the present action, *Brogden, J.*, has fully and logically gone into the pertinent decisions of the Court in respect to the location of roads constituting the Highway System. Can it be supposed for one moment that the Legislature would put into the hands of ten men—if they had the wisdom of Solomon—$85,000,000, with no restraint, but unbridled, to spend this money when and where they please in the State? Such a judicial dream comes not from the realities of life, but from the cloister of the confined student dealing in aircastles of kingly power, such as we read about in the story books long ago. The primary purpose of the State Highway Act was to take care of and foster the agricultural, commercial and industrial interests of the State. The Legislature, in the due exercise of its power, provided for ten Highway Commissioners, an administrative body, to carry out its will and mandate, giving this Highway Commission fixed, certain and limited powers. The largest appropriation ever made in the history of the State was made, and this enormous sum to be spent on roads was not left to a commission of ten, no matter how capable, efficient and honest they may be, without limitations. The mandate of the Legislature was the building of a fixed system, mapped by it for the commission. The Legislature, the creator, the commission, the agency. A map was attached to the act. It showed the 100 county seats, and marked on the map were the names of each county seat, without calling it a county seat. Also about 176 other places named on the map and the roads as shown on the map went through the county seats and the other places named, as set forth on the map. The general purpose as set forth in the act, was for the State to lay out, take over, establish and construct and assume control of approximately 5,500 miles of hard-surfaced and other dependable highways running *to all county seats and to all principal towns, State parks and principal State institutions*, etc., *with special views* of development of *agriculture, commercial and natural resources of the State;* and for the further purpose of permitting the State to assume control of the State highways, repair, construct and reconstruct and maintain them at the expense of the State and relieve the counties, cities and towns of the State of this burden. The intent was to *establish and maintain* a State system to be hard-surfaced as rapidly as possible, *of durable hard-surfaced, all-weather roads connecting the various county seats, principal towns and cities.*

Since the Halifax Convention, the whole history of the State was contrary to unlimited or arbitrary power. That convention, on 12 November, 1776, adopted the first Constitution of the State. The preamble is "A Declaration of Rights made by the Representatives of the Freemen of the State of North Carolina." The very first section was "That all political power is vested in and derived from the people only."

It took eight years before the surrender at Yorktown to make good that the divine right of kings to rule was at an end. I believe that this State will never recede from the principle, not only to make the "world" but "North Carolina" safe for democracy. No administrative body appointed by the law-making body with definite and fixed duties, by judicial decision can be given a monopoly of power and destroy any road, mapped, taken over and going through the county seats in the 100 counties of the State and the principal towns.

The dissenting opinion of the *Chief Justice* proceeds upon the theory that the defendant, Highway Commission, should have more power. It does concede that there are limitations in the statute, but omits to point out what these limitations are or to give any effect to them. The defendant admitted that the location of the road from Philadelphus Church to Pates is not in accordance with the legislative map. If so, the legislative map has been neither a hindrance nor an obstruction to the full exercise of the discretion of the defendant. If the defendant did not locate the road in accordance with the legislative map, then it must necessarily follow that it located it in the exercise of its own discretion and it ought not to complain of its own act and of the exercise of its deliberate judgment in selecting and incorporating into the State system, the highway in controversy. How many times did the statute contemplate that the defendant could exercise its discretion? It claims the right to exercise it in the same matter twice. If twice, why not a dozen times? It was to prevent this very uncertainty in regard to the location of highways that the statute provided the formalities which should be observed in locating highways, and it further provided "and the decision of the State Highway Commission shall be final." Citizens of the State had a right to rely upon these mandatory provisions of law, and they did rely upon them. They came upon these highways, bought property, built their stores and filling stations thereon with full faith that the General Assembly of this State knew what it was about in prescribing the formalities to be observed in establishing a fixed system of highways for the State and which would avoid the filling of the State with angry discord over the constant juggling of the roads of the highway system. But the dissenting opinion says "that the road has already been located, *though unwittingly on the part of everybody.*" This language means that the Legislature unwittingly made a map and unwittingly incorporated it as a part of the Road Act; that thereupon the defendant unwittingly made a map of the roads in Robeson County, which it unwittingly proposed "to constitute links" in the State Highway System; that thereafter the defendant unwittingly rendered a final decision in the matter and unwittingly took over, selected and assumed control of the road and has unwittingly maintained it for five years. It

is doubted if the defendant will admit that it has so unwittingly performed its duty since its creation.

Again, it is said, in referring to the legislative map: "A very remarkable map, indeed! I confess that it does not excite my admiration as a work of art, for it was never intended as such. It was prepared hurriedly by men in Raleigh who had no idea they were actually locating roads 'by painting highways on a painted landscape.'" The suggestion is that the Legislature in making the map by declaring that the map "is hereto attached to this bill and made a part hereof," was doing a very ridiculous thing. The act was carefully prepared by a committee of the Good Roads Association of the State. It was carefully prepared by the ablest men in the State then in the Legislature. It is considered over the Nation the most practicable piece of road legislation enacted. The two present dissenters do not agree with the combined judgment of that able body of public representatives. An examination of chapter 2, Public Laws 1921, will disclose a map. The legend upon the map is as follows: *"Prepared in office of State Highway Commission of Raleigh, N. C."* If it is a bad map, defendant made it. If it falls short of being a work of art, the defendant alone is responsible. If it is a "painted highway on a painted landscape," then the defendant painted the landscape, presumably, according to its own notions of art. Evidently, the defendant, in making this map attached to the act, assumed responsibility for it by putting its name thereon and claiming the authorship of it. It ought not to be permitted to disown its own child. At the time it was incorporated into the law, it was deemed sufficient as a basis of securing votes for the issuance of $50,000,000.00 of bonds. But it is further asserted that if the formalities prescribed by the statute in locating roads should be upheld that this would in effect amount to settling the location of highways by "legislative fiat." Does this mean that the Legislature has no power to locate a road, but that its servant, the Highway Commission, can do so? If this reasoning is correct, then the servant becomes greater than the master; the part greater than the whole; and the creature greater than the creator. Is there any reason why the Legislature could not locate a road by legislative decree? Every county in the State and every city in the State has been building highways for years by legislative fiat. The governing authorities of counties and cities have passed resolutions directing where streets and highways should be built and how they should be laid out and with what materials they should be paved. Doubtless, they never dreamed that this was building highways by legislative fiat and forbidden by the law.

Now, if the governing authorities of cities and towns of the State can locate highways by legislative fiat, by what process of reason can it

be maintained that the governing authorities of the entire State, to wit, its Legislature, cannot wield these mighty powers?

It is further contended that the Court is attempting to locate a road. I do not so construe the opinion. The Court holds that it has the right to determine when a highway runs to a county seat, and also to determine whether a county seat has been disconnected. In the *Cameron case,* the Court very readily declared that it could determine what a principal town was, although it was a "mixed question of law and fact." But it is now suggested that the Court cannot determine what a disconnection is when there is no dispute as to the fact. I do not think that the processes of reason have changed since the *Cameron case* was written.

It is further said that, "The State Highway Commission, with the aid of the commissioners of Robeson County and other local authorities, has determined that 'the most practicable route' from Red Springs to Lumberton is by way of Pembroke." The same defendant and the commissioners of Robeson County also determined in 1921 that the practicable route from Red Springs to Lumberton was the highway marked in red upon Exhibit "A." So far as this record discloses the road now is just as it was in 1921. There has been no change in the road. It is, therefore, just as practicable today as it was in 1921.

The dissenting opinion by *Mr. Justice Adams* sets up an imaginary case as to what would happen if the termination of the road at McNeill's Bridge had been presented for review. This would doubtless be an interesting proposition if presented, but it seems that no question was raised about this matter in the trial court, all parties apparently being satisfied. The Court, in its opinion, undertook to pass upon the question presented which was, among other things, whether or not the termination of the road at Pates amounted to a disconnection, and whether or not the express command of the Legislature that all roads in the system should "run to" and "connect" county seats had been complied with. Therefore, all fine-spun theories about McNeill's Bridge is not pertinent to this case.

The opinion says further: "The basic error pervading the opinion consists in assuming jurisdiction of the question which the Legislature has referred to an administrative agency of the State." The bald proposition, then, is that no citizen of the State can assert or maintain any right with respect to highways because it is "basic error" to assume that such jurisdiction resides anywhere except in the discretion of the defendant. Then again, it is said: "I think the fallacy implied in the questions quoted above lies in the assumption that by connecting with route 20 at Pembroke, route 70 would terminate at this place." Now, if route 70 does not terminate at Pates, where it intersects route 20,

what becomes of it? Not another inch of grading or excavation can be done upon it. Not an inch of paving could be laid upon it beyond that point. It becomes a lost road. Does it take to the air at Pates or is it in the contemplation of the mind deemed to continue an intangible ghostlike existence with No. 20? Aside from fine metaphysical distinctions, I think the road as a practical proposition terminates at Pates.

With all deference, I think the dissenting opinions do not undertake to meet, discuss or answer the propositions of law contained in the opinion of the Court, but may be fairly termed "confessions and avoidances" by academic discussion of questions not pertinent and an array of impossible, illogical and impractical conclusions.

The issue is clearly drawn. The dissenting opinions assert that the so-called and imaginary "gyves," "shackles" and "thraldom" imposed by law should be taken from the defendant, but if their prayer for relief is granted in the manner and for the reasons given therein, these same "gyves" and "shackles" and this same "thraldom" will be firmly riveted upon the citizens of this State so that they may ask but not be heard; they may knock but it will not be opened. I know not what course others may pursue, but as for me I will stand with undimmed faith for the privilege of the humblest citizen of this State to assert and maintain his rights with respect to the location of the highways.

STACY, C. J., dissenting: I have an abiding confidence that soon or late the Court will recede from the position first taken in the *Newton case* and repeated and extended in principle here. The two cases are at variance with the public policy of the State as established by a long line of decisions, extending over a period of more than half a century. *Brodnax v. Groom,* 64 N. C., 244, decided in 1870, and followed in probably as many as two hundred cases since. See Shepard's Citations and Allen's Reported and Cited Cases, 1926.

It is no duty of the courts to supervise, or to control, the discretionary powers of administrative bodies, except in cases of oppression or manifest abuse, and they ought not to go out of their way hunting such tasks. *Supervisors v. Comrs.,* 169 N. C., 548. To do so, says *Chief Justice Pearson* in *Brodnax v. Groom, supra,* would be to erect a "despotism of five men, which is opposed to the fundamental principles of our government and the uses of all times past." This expression is referred to in the Court's opinion, but apparently the further observation of the learned *Chief Justice,* made in the same connection, has been overlooked. Continuing, he said: "This Court has no power, and is not capable if it had the power, of controlling the exercise of power conferred by the Constitution upon the legislative department of the government or upon the county authorities." The

wisdom of this statement would seem to be abundantly supported by our recent disagreements in cases dealing with the powers of the State Highway Commission.

Speaking to the identical question in *Peters v. Highway Commission,* 184 N. C., 30, the late *Chief Justice Clark* said: "The courts are not empowered to supervise the action of administrative boards because of a difference of opinion as to the action taken or contemplated by the officials charged with the duties of administration." And in *Newton v. School Committee,* 158 N. C., 186, *Hoke, J.,* gave expression to the same position in forceful and emphatic language, as follows: "In some of the opinions, decided intimation is given that in so far as the courts are concerned the action of these administrative boards must stand unless so arbitrary and unreasonable as to indicate malicious or wanton disregard of the rights of persons affected. It is undesirable and utterly impracticable for the courts to act on any other principle."

Prior to the decision in *Newton v. Highway Commission,* 192 N. C., 54, it was never thought that the State Highway Commission, clothed, as it is, with certain administrative and governmental functions, chiefly those enumerated in 3 C. S., 3846(j), has less discretion in the location of roads than a township road commission, a county highway commission, or a board of county commissioners. But such is the law as now declared. I know the majority opinion says that the Legislature has so commanded and we must obey. Quite true, if such be its mandate, but I do not so understand the language employed in the statute, and it is recalled that even in the *Newton case* something was said about "the letter killeth, but the spirit giveth life."

Speaking to the question of authority in *Road Commission v. Highway Commission,* 185 N. C., 56, *Clark, C. J.,* delivering the opinion of the Court, said: "It was evidently the intent of the statute that the posting at the courthouse door was to give the State Highway Commission an opportunity to pass upon objections which might be raised against the proposed location by the local authorities and the restriction of 60 days in which such objection could be made, was a restriction upon the local authorities only. It was not intended to take from the State Highway Commission the general discretionary authority conferred in section 7 to 'change, alter, add to, or discontinue' the roads shown on the map posted by the Highway Commission."

The provisions of the statute applicable are as follows: "Fifty-five hundred (5500) miles shall be the approximate maximum limit of mileage of the State Highway System. The designation of all roads comprising the State Highway System as proposed by the State Highway Commission shall be mapped, and there shall be publicly posted

at the courthouse door in every county in the State a map of all the roads in such county in the State system, and the board of county commissioners or county road-governing body of each county, or street-governing body of each city or town in the State shall be notified of the routes that are to be selected and made a part of the State System of Highways; and if no objection or protest is made by the board of county commissioners of the county, road-governing body of any county, or street-governing body of any city or town in the State within sixty days after the notification before mentioned, then and in that case the said roads or streets, to which no objections are made, shall be and constitute links or parts of the State Highway System. If any objections are made by the board of county commissioners or county road-governing body of any county or street-governing body of the city or town, the whole matter shall be heard and determined by the State Highway Commission in session, under such rules and regulations as may be laid down by the State Highway Commission, notice of the time and place of hearing to be given by the State Highway Commission at the courthouse door in the county, and in some newspaper published in the county, at least ten days prior to the hearing, and the decision of the State Highway Commission shall be final. A map showing the proposed roads to constitute the State Highway System is hereto attached to this article and made a part hereof. The roads so shown can be changed, altered, added to or discontinued by the State Highway Commission: *Provided,* no roads shall be changed, altered or discontinued so as to disconnect county seats, principal towns, State or National parks or forest reserves, principal State institutions and highway systems of other states." 3 C. S., 3846(c).

Construing the above provisions in *Cameron v. Highway Com.,* 188 N. C., 84, *Adams, J.,* delivering the opinion of the Court, said: "We think it will appear, from a careful reading of those sections, that the roads outlined on the map were intended as a tentative and not as a completed or final system of highways. *Road Commissioners v. Highway Commission,* 185 N. C., 56. They were referred to in the act as comprising a system 'proposed' by the commission, and again as roads 'proposed' for the State Highway System. They were not intended to be unalterable. In section 7 the commission was given express power, subject to limitations, to change, alter, add to, and discontinue roads; and, apparently, with a view to removing all doubt as to the scope of this power in relation to the question under consideration, it was vested with the specific right 'to change or relocate any existing roads that it may now own or may acquire.' These definite and significant provisions convince us that the map cannot reasonably be accepted as a legislative fiat to construct a system of highways in strict

conformity with the roads 'proposed,' and that the roads may be changed, altered, relocated and discontinued in the sound discretion of the commission, subject to the limitations prescribed by law."

It will be observed that the finality of the decision of the State Highway Commission, mentioned in the statute, relates only to its decision on objections made by the local authorities within sixty days after a map of the proposed roads has been posted at the courthouse door. This is eminently proper, for such decision relates only to a preliminary or interlocutory question, and no appeal to the courts ought to be allowed or permitted until the final location of the road is to be determined. Then, as provided by 3 C. S., 3846(p), in cases calling for its application, "any party affected thereby shall be entitled to an appeal, and the procedure for such appeal shall be the same as provided in chapter twenty-one for appeals from decisions and determinations of the Corporation Commission." The plaintiffs, however, are not proceeding under this section, nor is it a case for such procedure. They are seeking to enjoin the State Highway Commission from locating the road via Pembroke on the ground that such action is unlawful. This is the sole basis of plaintiff's suit. We are therefore not now concerned with the wisdom or impolicy of the proposed change in the highway, but only with the legality of such change.

An erroneous position once taken and adhered to is difficult to maintain, and when such is the case, as here, elaboration not infrequently results in *reductio ad absurdum.* How is the Highway Commission to proceed in the future? It is admitted that the road in the instant case, running from Philadelphus Church to McNeill's Bridge, heretofore designated as a part of route No. 70, is not the same as that shown on the legislative map of 1921. But it has been taken over as such, and, according to the logic of the Court's opinion, it cannot now be abandoned or discontinued as a part of the State System. Why not? Express statutory authority is given the Highway Commission to "change, alter, add to, or discontinue" any of the proposed roads shown upon the legislative map after they have been taken over as a part of the State System, subject only to the prohibition against disconnecting county seats, principal towns, State or National parks or forest reserves, principal State institutions and highway systems of other states. In the *Cameron case,* the entire road from Oxford to Durham, via Stem, was abandoned or discontinued, after it had been taken over and maintained as a part of the State System for three years, and an entirely different road, running by Creedmoor, was substituted in its place. This was held to be lawful, though Stem appeared on the legislative map, and Creedmoor did not. But it is now said that a much less deviation in Robeson County is unlawful. Is the law different in Robeson from

what it is in the counties of Durham and Granville? Under this interpretation it may be doubted as to whether a single one of the highways, going to make up the State System, has been built in strict compliance with the law's command.

Speaking to the question in *Johnson v. Comrs.,* 192 N. C., 561, *Connor, J.,* said: "No question or issue of fact involved in the decision of the Highway Commission with respect to the location of route 21 is raised by the pleadings requiring that it be submitted to or passed upon by a jury; whether the Highway Commission had the power to change the location of the road, presents a question of law only to be determined by the Court. We are of the opinion that the Highway Commission had such power, and that upon the facts alleged in the complaint its exercise of such power is not subject to judicial review."

In *Newton v. Highway Commission, supra,* it was said: "The Court cannot direct the location of the road," and this case is cited with approval in the Court's opinion. Is the Highway Commission, therefore, to understand that the Court is not directing the location of the present road, but is saying that the commission may not abandon or discontinue any part of the road heretofore taken over? If so, which holding is the Highway Commission to follow in the future, the one which says the Court will not direct the location of the road or the one which says the road heretofore taken over may not now be abandoned or discontinued? Has not the Court in effect done in the second breath what it said it would not do in the first? The location of the road is the point at issue in the present suit, hence the two expressions are difficult to reconcile when it comes to applying the law to variant facts.

I know the reply is, the road has already been located and the Court is not undertaking to locate the road, but only declaring what constitutes a permanent location under the statute. But what is the difference, on the facts of the present record, between directing a location and declaring that a permanent location has already been made, when the location of the road is the very question at issue? The plaintiffs say it should be located at one place, the interveners at another and the defendant at still another. The Court says that the road has already been located, *though unwittingly on the part of everybody,* and that said location may not now be abandoned or discontinued. In the *Newton case,* the Court was careful to point out that it would not direct the location of roads. Then the question still remains: Does the Court intend to locate the present road by judicial decree or not? If it does not so intend to locate the road, the result is "confusion worse confounded." On the other hand, if the road is to run from Philadelphus Church to McNeill's Bridge as originally taken over, it

will do so by judicial decree and not otherwise, for no one charged with the duty of designating the roads which are to constitute the State System, thinks it ought to go that way. So in the end, it would seem, that in the instant case the location of the road in controversy is to be made by the Court, and not by the Highway Commission.

The fundamental error in this case lies in the fact that the Court is undertaking to deal with a matter which properly belongs to another tribunal. The location of the road in question has been determined by the State Highway Commission in the exercise of authority conferred upon it by statute. There is no suggestion of any arbitrary action or abuse of discretion on its part. We are, therefore, concerned solely with the lawfulness of the proposed change, and nothing else. That it is in the interest of economy and produces a more practical and convenient route is the judgment, not only of the Highway Commission, but of the local authorities as well.

In the next place, the Court has erroneously assumed, it seems to me, that if the road from Philadelphus Church to McNeill's Bridge is run via Pembroke (even at an increased distance of 2.9 miles, but at a saving in cost of approximately $225,000.00) Raeford, the county seat of Hoke County, *ipso facto* will be disconnected from Lumberton, the county seat of Robeson County, by a distance of thirteen miles, or the distance from Pembroke to Lumberton. The finding of the trial court, in this respect, is not supported by the evidence, and it is not binding on us if it were. The road is not going to stop at Pembroke simply because that portion of it from Lumberton to Pembroke has already been hard-surfaced. The road from Lumberton to Pembroke will become as much a part of route No. 70, as it is now a part of route No. 20, just as the road from Cary to Raleigh is a part of two routes and serves to connect both Durham, the county seat of Durham, and Sanford, the county seat of Lee, with Raleigh, the county seat of Wake.

Clinton and Burgaw are connected with Wilmington by roads which converge at Castle Hayne. Smithfield and Goldsboro are connected with Wilson by roads which converge at Contentnea. The roads which connect Snow Hill and Kinston with Goldsboro become common some distance east of Goldsboro. And the roads which connect New Bern and Greenville with Kinston intersect at a point several miles north of Kinston. Without these and similar economies, it is reasonable to suppose that the county seats, principal towns and other termini mentioned in the Act of 1921, would never be linked together in one comprehensive system of State highways. It is estimated that more than 20,000 miles would be required to run a direct road from every county seat to every other county seat and principal town in the State.

Why should it be necessary to parallel these two roads, approximately a mile apart for a distance of ten miles at an increased cost of $225,000.00 when a single road will serve all the traffic? One reason assigned is that the proposed change is not in accord with the legislative map. Neither is the road that has been taken over. The map, therefore, is to be used only to prevent a change in location and not for the purpose of determining the correct location, otherwise the interveners might prevail. A very remarkable map, indeed! I confess that it does not excite my admiration as a work of art, for it was never intended as such. It was prepared hurriedly by men in Raleigh, who had no idea they were actually locating roads "by painting highways on a painted landscape," and I cannot think the Legislature intended to adopt it as a work of finality, else the State Highway Commission would never have been given authority to employ engineers who use transit and tape.

Speaking to this position, in his excellent brief, the learned Assistant Attorney-General, Mr. Ross, well says: "These *proposed* roads, as said by *Mr. Justice Adams* in *Cameron v. Highway Commission,* 188 N. C., 187, 'were not intended to be unalterable.' They were to be laid out 'by the most practical routes.' To attempt to view them as the then existing traveled highways—the majority of which had been built without engineering advice at all, and some had only followed the trail of the savage or the buffalo—would, in the very beginning, have shackled the Highway Commission to a dead past."

The case, in its final analysis, presents but a single question. It is this: Has the location of all the highways, going to make up the State System, been settled in advance by legislative fiat, or is this a matter to be determined by the State Highway Commission? Before a road can be built, it must be located at some definite and specific place on the ground. Who is to say where that place shall be? I think the Legislature has wisely committed this question to the decision of the State Highway Commission in the exercise of a sound but not arbitrary judgment. It is undesirable and utterly impracticable to build roads in any other way. It is not to be presumed that the Legislature intended a policy of reckless extravagance rather than one of prudent economy in providing for the construction and maintenance of a State System of hard-surfaced and other dependable roads, connecting by the most practicable routes the various county seats and other principal towns of every county in the State.

The State Highway Commission, with the aid of the commissioners of Robeson County and other local authorities, has determined that "the most practical route" from Red Springs to Lumberton is by way of Pembroke. The wisdom of this decision is neither questioned nor

denied; but it is alleged that another road between these two places has already been taken over and that it has now become a part of the State System and as such cannot be abandoned or discontinued. When did a sovereign state ever commit itself to such a policy before?

There is another provision of the judgment deserving of attention. It is not only held that the entire road, heretofore taken over as route No. 70, has now become a part of the State System, and as such, may not be abandoned or discontinued, either in whole or in part, but the defendant is also restrained from building any road "from Philadelphus along the yellow line to a point in the vicinity of Pembroke." Why this specific injunction? Is the Highway Commission limited in its work to the construction and maintenance of roads shown upon the map, except in those cases where it has inadvertently taken over a road which does not appear thereon? If so, then the law sanctions an "ignorant" departure from the map and condemns an "intelligent" one.

It is specifically provided by 3 C. S., 3846(j) that the State Highway Commission shall have power "to locate and acquire rights of way for any new roads that may be necessary for a State Highway System, with full power to widen, relocate, change or alter the grade or location thereof; to change or relocate any existing roads that the State Highway Commission may now own or may acquire," etc. This language would seem to be too plain for debate or for any diversity of opinion. But for some reason not stated by the majority we construe it differently.

The road which connects Raeford, the county seat of Hoke County, with Lumberton, the county seat of Robeson County, runs by Red Springs, Philadelphus Church, thence east of Pembroke to McNeill's Bridge and on into Lumberton. As a more practical route it is proposed to run this same road by Red Springs, Philadelphus Church, Pembroke, thence to McNeill's Bridge and on into Lumberton. And yet it is seriously contended, and actually held for law, that, if that portion of the road between Philadelphus Church and McNeill's Bridge is deflected so as to run by Pembroke, this will disconnect the two county seats. If the two county seats are thus disconnected by the distance from Lumberton to Pembroke, why not by the distance from Lumberton to McNeill's Bridge, or by the distance from Lumberton to Philadelphus Church, or by the distance from Lumberton to Red Springs? What is there about Pembroke that a road cannot pass without stopping?

Under the statute, as now interpreted, it would seem that the State Highway Commission, instead of trying to serve all the people of the State, as it has been and is now doing, should have started at a given

point, moved as rapidly as it could, but taking care not to assume control of any road, either in whole or in part, which, in its judgment, ought not to become a permanent link in the Highway System, for once having taken it over it could not thereafter be abandoned or discontinued. This would have given one section of the State a first and prior advantage over other sections, to be equalized only as the work progressed, but it appears that, in no other way would it have been possible to comply with the statute as presently interpreted. It certainly has not been complied with up to date, for heretofore it has been thought that it had quite a different meaning. Our own decisions have been otherwise. With due deference to my brethren, I think the interpretation now placed on the statute is, not only strained, but entirely at variance with the intent of the Legislature.

It is conceded that when the meaning of a statute is plain and its provisions susceptible of but one intepretation, its consequences, if objectionable, can only be avoided by a change in the law itself. But where the purpose of the Legislature is not clearly expressed, it is always to be presumed that a statute was intended to have the most reasonable and beneficial operation permissible from the language used. And when a statute is ambiguous in terms, or fairly susceptible of two interpretations, the injustice, hardship, or inconvenience which is likely to follow the one construction, or the other, may be considered, and a construction of which the statute is fairly susceptible may be placed upon it, so as to avoid all such objectionable consequences and advance what must be presumed to be its true object and purpose. 25 R. C. L., 1018. In short, it is well settled that if the language of a statute be obscure or ambiguous and its meaning not clearly designated, the effects and consequences of the one construction or the other may and ought to be resorted to as important aids in determining its true meaning and intent. 2 Lewis' Suth. Statutory Construction (2 ed.), secs. 488-490.

But why pursue the matter at greater length? *Cui bono?* Enough has already been said to demonstrate the necessity of further legislative action in order that the State Highway Commission may proceed, in some workable way, with the construction of the State highways. Without such relief, the Commission must now labor under the tyranny and thraldom of intolerable restrictions, which, in my opinion, were never intended by the Legislature; indeed, which cannot be observed if the highways of the State are to be constructed with any regard whatever for economy and the first principles of civil engineering. Nevertheless, the law is, as it is declared. And while all are compelled to bow to the present attitude of the majority, I do so with a firm conviction that the judgment is erroneous, both in principle and result.

ADAMS, J., dissenting: I dissent from the opinion of the Court, not only because I believe it to be unsound in theory and unwise in policy, but because in my judgment it is based upon fundamental error and upon a misconception of the purpose and spirit of the act by which the State Highway Commission was created. Moreover, excepting the *Newton case,* with which it may not in all respects accord, the opinion, as I read it, combats all previous decisions construing the statute, and cannot be harmonized with them through the medium of doubtful or refined distinctions.

The basic error pervading the opinion consists in assuming jurisdiction of a question which the Legislature has referred to an administrative agency of the State. In the determination of the present controversy this exercise of jurisdiction in effect sanctions three propositions: (1) to deflect route 70 from B to C and back to D is necessarily to disconnect Raeford and Lumberton; (2) when a road is once taken over by the State Highway Commission it becomes permanently fixed, and cannot thereafter be changed, altered, or discontinued; (3) the discretion of the Highway Commission is reduced to a narrow and rigidly limited compass.

With respect to the first of these, the position of a majority of the Court is stated in this way: "Does a highway 'run to' a county seat when it terminates at a point thirteen miles from its corporate limits? Does a highway connect a county seat when it lacks thirteen miles of touching it at all? To ask these questions, nothing else appearing, is to answer them in the negative. Therefore, the inevitable conclusion is, that if the road as proposed by the defendant does not 'run to' and 'connect the county seats involved,' there has been no compliance with the express terms of the law. And if the road, as proposed by the defendants, disconnects a county seat, then this also would violate the express terms of the statute."

The force of this argument may be measured by referring to the record in connection with the map filed in the cause. The road "proposed by the defendant" diverges from the line marked route 70 at Philadelphus (B), extends to Pembroke (C), connects with route 20, and proceeding along this route passes D and goes on to Lumberton. The question of principal towns is not involved.

The trial judge held that to make the proposed change would "disconnect the towns of Raeford and Lumberton by thirteen miles"; but as this conclusion involves a mixed question of law and fact, and as this is a proceeding in equity, the finding is subject to review. However, a majority of the Court approve the finding and decide as a matter of law that the defendant has no legal right to make the proposed change and must maintain route 70 from B to D. It may be argued with force that

in this way the decision in reality locates the road; in any event it refuses to permit a change. Now, what is the result? It is said in the opinion that prior to the ratification of the Road Act there was a road extending from Raeford to Lumberton via Red Springs; that the Highway Commission took it over and called it route 70; that by the same process route 20 was established as a separate, distinct, and independent road, constituting the sole and only connection between the county seats of Laurinburg and Lumberton; and that No. 20 has been paved without material "change, alteration, or discontinuance." I think the fallacy implied in the questions quoted above lies in the assumption that by connecting with route 20 at Pembroke route 70 would terminate at this place. Why should it? If by making the proposed change route 70 would terminate at Pembroke (C), why by the same logical process does it not now terminate at McNeill's Bridge (D)? If No. 70 cannot extend along No. 20 from Pembroke to Lumberton, by what sort of logic can it extend along No. 20 from McNeill's Bridge to Lumberton? If No. 70 terminates at D and does not extend along No. 20, then to change it would not disconnect Raeford and Lumberton. If No. 70 extended from Raeford to Lumberton before the Highway Commission was created, then under the reasoning in the opinion No. 20 running from Laurinburg terminates at McNeill's Bridge, where it connects with No. 70. Yet it is said in the opinion that No. 20 is the sole connection between Laurinburg and Lumberton. If Nos. 70 and 20 can extend along the same roadbed from McNeill's Bridge (D) to Lumberton, why could they not extend along the same roadbed from Pembroke to Lumberton? Does one part of the statute apply to the road between McNeill's Bridge and Lumberton and another part to the road between Pembroke and Lumberton? If deflecting No. 70 as proposed would "disconnect the towns of Raeford and Lumberton by thirteen miles," the distance from Pembroke to Lumberton, why are these towns not already disconnected by three miles, the distance from McNeill's Bridge to Lumberton? For according to the logic of the opinion the deduction is that No. 70 or No. 20 must terminate at McNeill's Bridge; both cannot extend along one roadbed. But which shall it be? Obviously No. 70 because, says the Court, No. 20 connects Lumberton and Laurinburg. These, it seems to me, are some of the inconsistencies which flow from an argument resting upon premises or propositions which cannot be maintained. Apparently they are the product of the Court's departure from the interpretation given the statute in former decisions, manifested first in the *Newton case* and extended here far beyond any previous judicial utterance. The result is that the proposed change, which would increase the distance of the road in question only 2.9 miles

MAP # 1
CARLYLE ET AL VS STATE HIGHWAY COMMISSION
ROBESON COUNTY

TABLE OF DISTANCES

CONSTRUCTION — DISTANCE

RED ROUTE: FROM POINT "A" THE SOUTHERN TOWN LIMITS OF RED SPRINGS TO CONNECTION WITH HARD SURFACE ON ROUTE 20 POINT "D" VIA ROUTE 70 = 15.894 MILES

YELLOW ROUTE: FROM POINT "A" THE SOUTHERN TOWN LIMITS OF RED SPRINGS TO CONNECTION WITH HARD SURFACE ON ROUTE 20 POINT "C" AT PEMBROKE = 9.335 "

6.539 "

TRAVEL — DISTANCE

YELLOW ROUTE: FROM POINT "A" THE SOUTHERN TOWN LIMITS OF RED SPRINGS VIA POINT "C" PEMBROKE AND ROUTE 20 TO THE COURT HOUSE AT LUMBERTON = 22.120 MILES

RED ROUTE FROM POINT "A" THE SOUTHERN TOWN LIMITS OF RED SPRINGS VIA ROUTES 70 AND 20 TO THE COURT HOUSE AT LUMBERTON 19.159 "

IN FAVOR RED ROUTE 2.961

FROM POINT "A" THE SOUTHERN TOWN LIMITS OF RED SPRINGS VIA ROUTE 70 TO POINT "D" THEN ROUTE 20 TO POINT "C" AT PEMBROKE = 25.394 MILES

LEGEND
WHITE LINE
RED LINE
YELLOW LINE
BROWN LINE
ORANGE LINE

LOCATION DEPARTMENT
N C STATE HIGHWAY COMMISION
PRELIMINARY TOPOGRAPHICAL MAP
PROJECT 399 ROBESON COUNTY
SURVEYED BY J M YOUNG 9-2-26

at an estimated saving of $225,000, is held for the first time to be beyond the powers conferred by law upon the defendant.

As to the question whether taking over a road locates it, little need be said. If when this is done the "period of proposing ends and the period of permanent links begins," unless section seven is without meaning the period of changing, altering, adding to, and discontinuing roads does not end. By the very terms of the statute the right "to change or relocate any existing roads that it (the defendant) may now own or may acquire" continues. This provision is as unambiguous as it is significant. Can it be said with any degree of plausibility that after the Highway Commission has taken over and assumed control of an existing county road, as in this case, it is forever barred against changing or discontinuing it by an imaginary "fitting of the map to the ground"? If so, a large proportion of the highways in this State have been constructed without authority of law. The building of roads in North Carolina is not a simple task; difficult problems must be solved; complex conditions must be met; unforeseen contingencies arise; prevision is demanded; changes are imperative; and if the decision on this point must be adhered to, the work of the commission will hereafter move on as if fettered with gyves or shackles.

The opinion contains repeated references to the defendant's exercise of discretion, from which it is possible to infer that its exercise of discretion as previously declared by the Court is still recognized as a legal right; but a careful reading will show that the opinion restricts the defendant's discretion to such a narrow compass as to make its exercise for practical purposes well-nigh a nullity. The boundary prescribed for this imputed discretion it is not hard to discover. In construing the statute the Court declares that after a road is once taken over or accepted discretion ceases. This construction overlooks the fact that while in certain respects the defendant's discretion may not transgress prescribed bounds, in other respects it is enlarged by the statute beyond the border of discretionary powers generally conferred by law upon administrative boards. Reference is made to the divergence of opinion as reflected on the question in the *Cameron case*. On this point one of the opinions was in effect a dissent, and of course was not in accord with the opinion of the Court in that case. The other two opinions accord in saying that the State Highway Commission is clothed with limited legal discretion, including the discretion expressly conferred by the statute, subject to the limitation contained in the proviso of section seven; also in saying that after a road is taken over it may be altered, changed, or discontinued. The substantial divergence had reference to another question, namely, whether the definition of a "principal town" involves law as well as fact or whether it is a question of fact determin-

able like many other questions in the sound discretion of the Commission. The excerpt taken from the opinion of *Stacy, J.*, refers solely to this question. The opinion in the case at bar after quoting the clause from the opinion of the Court in the *Cameron case,* comes to a full and permanent stop without any reference to the context, which shows full recognition of the discretion conferred upon the commission subject to the limitation in the proviso which has been set out. I am unable to see why this difference of opinion on the legal question whether the term "principal towns" involves law and fact must occupy the vast expanse between zenith and nadir.

The right to exercise discretion in building highways should not be so limited as to make the Highway Commission an automatic mechanism; but so far as my research discloses, the Court up to this time has never made a decision which limits the discretionary power of any similar administrative and governmental agency as the present decision limits the discretionary power of the defendant. The ultimate effect of these "intolerable restrictions" the future will reveal.