STATE OF NORTH CAROLINA v. HENRY EUGENE BROWN

No. COA09-1693

(Filed 3 May 2011)

**1. Evidence— possession of incestuous pornography book—motive and intent**

The trial court did not err in an indecent liberties with a child and first-degree rape case by allowing into evidence under N.C.G.S. § 8C-1, Rule 404(b) defendant father's "Family Letters" book to show both motive and intent in committing the acts underlying the charged offenses. It was reasonable to infer incestuous desire from possession of incestuous pornography, and the admission of this evidence did not unfairly prejudice defendant. To the extent the admission of evidence regarding defendant's alleged sexual encounter with the younger daughter exceeded the scope of permissible corroboration, it did not amount to plain error.

**2. Satellite-based Monitoring— lifetime enrollment—aggravated offense—rape of child under thirteen**

The trial court did not err in an indecent liberties with a child and first-degree rape case by ordering defendant to enroll in lifetime satellite-based monitoring. Rape of a child under the age of thirteen was an aggravated offense since it necessarily involved the use of force or threat of serious violence.

Appeal by Defendant from judgments entered 17 July 2009 by Judge Dennis J. Winner in Jackson County Superior Court. Heard in the Court of Appeals 18 August 2010.

*Attorney General Roy Cooper, by Assistant Attorney General Jane Rankin Thompson, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defendant Kristen L. Todd, for Defendant.*

STEPHENS, Judge.

*Factual and Procedural Background*

On 31 October 2005, Defendant Henry Eugene Brown ("Brown") was indicted on one count of indecent liberties with a child and one count of first-degree sex offense with a child.[1] Brown was tried

---

1. On 14 July 2009, just prior to commencement of his trial, Brown was also indicted on one count of statutory rape.

before a jury at the 13 July 2009 Criminal Session of Jackson County Superior Court, the Honorable Dennis J. Winner presiding. The evidence presented by the State at trial tended to show the following: Brown and his wife have three children, Sally, the victim in this case, Frank, and Jessica.[2] Sally, the oldest, was ten years old at the time of trial. Sally testified that, during September 2005, Brown took her into his bedroom, removed her clothes, got on top of her, and put his "worm" inside her "private" and moved up and down. She then demonstrated what had happened with dolls. Sally identified pictures she had drawn of herself and her parents illustrating her mother's "kitty" and her father's "worm." Sally stated that this event only happened once. She said that she had reported this event to her mother and her teacher Dorothy Coone ("Coone") and that she later spoke with a social worker and the police. After reviewing her drawings on redirect examination, Sally indicated that her sister Jessica was on the floor when the event occurred and that when she held her father's penis she could see her mother's breasts. Several health care and counseling professionals who had met with Sally corroborated Sally's story by testifying as to what Sally had told them. Dr. Cynthia Brown ("Dr. Brown"), a child abuse specialist who examined Sally, testified that she found no physical evidence of vaginal or anal penetration, but that finding no evidence of penetration was not inconsistent with a report of sexual abuse, particularly after a lengthy passage of time. Coone testified that Sally had been telling fifth grade boys that her father had raped her.

Amanda Parker ("Parker"), a friend of Brown's wife whom the Browns used as a caretaker, testified that sometime in early fall 2005, Brown's wife showed Parker "Family Letters," an erotic publication containing anonymous "letters" purporting to describe the correspondents' sexual experiences with other family members. Graphic illustrations accompanied the "letters." Although the publication upset Parker, she continued to take care of the children.

During the weekend of 25 September 2005, Parker and her sister took the Browns' children to Asheville for a weekend outing to the fair and mall. Because their outing finished late in the evening, they spent the night at a motel room. While watching a movie in their motel room, Sally told Parker that her father sexually abused her. A discussion between Parker, her sister, and all three children followed. Upon their return to Jackson County on 27 September 2005, Parker

---

2. Pseudonyms are used to protect the privacy of the juveniles.

reported the abuse allegations to Kim Davis ("Davis"), a foster care social work supervisor at the Jackson County Department of Social Services ("DSS"). The report triggered an immediate DSS investigation.

Davis and Detective Celeste Holloman ("Detective Holloman") went to the children's school to interview them. Initially, the statements they received from Sally were consistent with the reported conversations the children had with Parker. After interviewing the children at school, Davis and Detective Holloman went to the Browns' home to inform the Browns of the allegations and explain the available custody options. Detective Holloman and Davis were allowed into the Browns' home and Detective Holloman received permission from the Browns to search the premises. Brown's collection of adult erotic literature, including Family Letters, was seized during the search. Detective Holloman testified that Brown told her that Family Letters belonged to the Browns.

Brown moved the court to exclude Family Letters from evidence, but the trial court denied Brown's motion and admitted Family Letters as evidence of Brown's "intent or motive with respect to the alleged crimes." The trial court contemporaneously instructed the jury that they could consider the publication only if the jury found the publication relevant to Brown's motive or intent to commit the charged crimes.

At the close of the State's evidence, the trial court dismissed the first-degree sex offense charge. Brown then took the stand and denied having any sexual contact with Sally and denied ownership of Family Letters. Brown claimed DSS and other agencies had coached Sally into making the allegations against him and presented evidence of a conversation between Sally and Davis in which Sally stated that her friends told her to lie about what happened and that Brown had not sexually abused her. At the time of the conversation, Sally was living with friends of Brown, and his wife and Brown did not have custody of Sally. Joyce Freeman, Brown's mother-in-law, testified that when Sally was in her care, Sally stated that her friends told her to lie about sexual abuse and that no such abuse had occurred. James Freeman, Joyce Freeman's husband, testified that he had heard Sally recant on a different occasion.

At the close of all evidence, Brown was convicted of indecent liberties with a child and first-degree rape. Brown was sentenced to 240 to 297 months on the first-degree rape charge and 13 to 16 months on the indecent liberties charge, which sentences were to run consecutively. Brown was also ordered to register as a lifetime sex offender

and to enroll in satellite-based monitoring ("SBM") upon his release from prison. Brown gave timely oral notice of appeal.

*Discussion*

*I. Trial*

**[1]** On appeal, Brown first argues that the trial court erroneously "allowed into evidence the 'Family Letters' book because it was irrelevant, inadmissible character evidence and substantially more prejudicial than probative." Brown contends that because "there was no evidence that [he] ever showed the 'Family Letters' book, or any type of pornographic material, to [Sally,]" "[t]he 'Family Letters' book was not[] relevant to any issue other than [Brown's] character, and should have been excluded" under North Carolina Rule of Evidence 404(b).

Rule 404(b) provides that while evidence of "other crimes, wrongs, or acts" is not admissible "to prove the character of a person in order to show that he acted in conformity therewith," such evidence is admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." N.C. Gen. Stat. § 8C-1, Rule 404(b) (2009). In this case, the trial court denied Brown's motion *in limine* to exclude Family Letters because the court found the evidence to be "circumstantial evidence" "bear[ing] upon [Brown's] intent and motive [] with respect to the alleged crimes." On appeal, however, Brown argues that denial of his motion was error because evidence that a defendant "simply possessed pornographic materials" is inadmissible under Rule 404(b) absent "evidence that the defendant used the materials during the perpetration of the alleged offense or showed the materials to the victim at or near the time of the crimes." We disagree. That such evidence is inadmissible under Rule 404(b) absent the existence of such limited circumstances is a misapplication of the rule.

"Rule 404(b) is 'a clear general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged.' " *State v. Locklear*, 363 N.C. 438, 447, 681 S.E.2d 293, 301-02 (2009) (quoting *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990)) (emphasis in original). Accordingly, rather than evidence of possession of pornography being generally inadmissible under Rule 404(b) unless the pornography

was shown to the victim or involved in the commission of the offense, evidence of possession of pornography is generally admissible if it provides relevant "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." N.C. Gen. Stat. § 8C-1, Rule 404(b).

In arguing that Family Letters was inadmissible because it was not shown to Sally or was not "used in the commission of the offense," Brown relies on previous decisions by this Court holding that evidence of possession of pornography, or evidence of deviant sexual conduct, was inadmissible because the evidence in each case did not serve an appropriate Rule 404(b) purpose. *See State v. Bush*, 164 N.C. App. 254, 595 S.E.2d 715 (2004) (evidence of the possession of pornography); *State v. Smith*, 152 N.C. App. 514, 523, 568 S.E.2d 289, 295 (evidence of defendant's possession of pornographic materials), *disc. review denied, appeal dismissed*, 356 N.C. 623, 575 S.E.2d 757 (2002); *State v. Doisey*, 138 N.C. App. 620, 626, 532 S.E.2d 240, 244-45 (2000) (evidence that defendant placed a camcorder in a bathroom used by children and others which taped the activities in the bathroom); *State v. Maxwell*, 96 N.C. App. 19, 24, 384 S.E.2d 553, 556-57 (1989) (evidence that defendant frequently appeared nude in front of his children and fondled himself in the presence of his adopted daughter).[3] However, these holdings, in light of the inclusive nature of Rule 404(b), cannot be read to create any broadly-applicable rule with respect to the admissibility of pornography in a criminal case.[4]

---

3. *But see State v. Owens*, No. COA08-1279, 2009 N.C. App. LEXIS 785 (2009) (unpublished) (admitting evidence of "child pornographic video with an incestuous theme, other child pornographic images, and incestuous stories" because the evidence was "relevant to show [defendant's] intent and motive to commit sexual acts with the nine-year-old female [victim]").

4. To the extent *Smith* has been interpreted to create a bright-line rule that evidence of the mere possession of pornography is inadmissible to show intent, preparation, plan, knowledge or absence of mistake (the only purposes discussed in *Smith*), *see State v. Delsanto*, 172 N.C. App. 42, 52, 615 S.E.2d 870, 876-77 (2005); *Bush*, 164 N.C. App. at 254, 595 S.E.2d at 715, we note that this Court in *Smith* based its decision solely on the issues before it and was attempting to distinguish that factual context from the contexts of *State v. Rael*, 321 N.C. 528, 533-34, 364 S.E.2d 125, 129 (1988) (holding that evidence of pornographic pictures and movies was admissible to corroborate the four-year-old victim's testimony that the defendant showed him these items during the commission of the alleged sexual offenses) and *State v. Williams*, 318 N.C. 624, 632, 350 S.E.2d 353, 358 (1986) (holding that evidence of a defendant's insistence that his daughter attend and watch an x-rated film with him was relevant to show the defendant's "preparation and plan to engage in sexual intercourse with her and assist in that preparation and plan by making her aware of such sexual conduct and arousing her"), rather than creating a broad rule of inadmissibility. *Cf. Bush*, 164 N.C. App. at 266-68, 595 S.E.2d at 723-24 (Levinson, J. dissenting) (concluding that

The determination in each case was not whether possession of pornography is ever relevant to serve a purpose other than proving a defendant's propensity to act in a certain way. Rather, the determination in each case was whether possession of pornography *in that case* provided relevant, non-propensity proof under the circumstances of the case. *See Doisey*, 138 N.C. App. at 626, 532 S.E.2d at 244-45 (holding that the evidence of defendant taping "activities in the bathroom" was evidence of "conduct dissimilar to the conduct with which [d]efendant was charged" and, "therefore, did not tend to show [d]efendant's plan or scheme to sexually assault [the victim]"); *Maxwell*, 96 N.C. App. at 24-25, 384 S.E.2d at 556-57 (holding that the evidence of defendant's nudity "tended to make defendant appear to be a sexual deviant" and was of "questionable relevance" because defendant regarded nudity as "normal" and the only testimony involving defendant fondling himself in front of his adopted daughter also revealed that defendant attempted to hide this behavior from her); *Smith*, 152 N.C. App. at 519, 522-23, 568 S.E.2d at 293, 295 (holding that evidence of defendant's "mere possession" of general pornography in his home was irrelevant to show his intent to engage in a sexual relationship with his 12-year-old stepdaughter); *Bush*, 164 N.C. App. 254, 261, 595 S.E.2d 715, 719 (holding that evidence of defendant's possession of general pornography was "tenuously related to the crime charged" and was inadmissible to prove any proper purposes under Rule 404(b)).

The circumstances of this case, however, are easily distinguishable from the above-cited cases: the possession was of an uncommon and specific type of pornography; the objects of sexual desire aroused by the pornography in evidence were few; and the victim was the clear object of the sexual desire implied by the possession. Accordingly, the relevance of the evidence of Brown's possession of Family Letters is not governed by this Court's prior decisions holding as inadmissible evidence of a defendant's possession of general pornography, and we conclude that the trial court correctly admitted evidence of Brown's possession of Family Letters as relevant evidence showing both Brown's motive and intent in committing the acts underlying the charged offenses, two proper purposes for such evidence under Rule 404(b).

Regarding the first Rule 404(b) purpose, the trial court admitted the Family Letters evidence as "circumstantial evidence" bearing

---

careful analysis of *Smith* "reveals that it neither establishes such a broad and blunt rule, nor could it have" and stating that "*Smith* and the cases it cites require the courts to review each piece of evidence in the context of the case in which it is presented").

upon Brown's "motive with respect to the alleged crimes." "Motive" is defined as "something within a person (as need, idea, organic state, or emotion) that incites him to action," Websters Third New International Dictionary, (Unabridged 2002), and North Carolina Courts have long held that the State may offer evidence of a defendant's motive "as circumstantial evidence to prove its case where the commission of the act is in dispute when '[t]he existence of a motive is [] a circumstance tending to make it more probable that the person in question did the act.' " *State v. Hightower*, 331 N.C. 636, 642, 417 S.E.2d 237, 240-41 (1992) (quoting 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 83 (3d ed. 1988)) (bracket in original). In proving motive, our Courts have allowed the State to present evidence of a defendant's lack of monetary resources in a prosecution for robbery, *State v. al-Bayyinah*, 359 N.C. 741, 748, 616 S.E.2d 500, 506 (2005) ("Defendant's statement that he was expected to make a living outside prison clearly shows a motive for the robbery of the grocery business."); evidence of "financial obligations and pending lawsuits against the defendant" in a prosecution for felonious burning, *State v. Harrell*, 20 N.C. App. 352, 356, 201 S.E.2d 716, 718 (1974); evidence of a defendant's opportunity to financially benefit from murder in a prosecution for murder, *State v. Bishop*, 346 N.C. 365, 383, 488 S.E.2d 769, 779 (1997) (noting that "the evidence that defendant sold the victim two life insurance policies and that both policies were amended to make defendant the primary beneficiary was relevant to show a motive for the killing"); and evidence of "defendant's frustration and need to find money" in a kidnapping and murder prosecution, *State v. Parker*, 354 N.C. 268, 286, 553 S.E.2d 885, 898 (2001) (holding that defendant's disturbance at a bank was relevant and admissible to show defendant's need for money and the motivation to commit the kidnapping and ultimate murder), *cert. denied*, 535 U.S. 1114, 153 L. Ed. 2d 162 (2002). In each of these cases where the defendant desired money, evidence of that desire was relevant to show the defendant's motive in committing the acts underlying the offense. Such evidence did not prove, at least in any relevant way, the defendant's propensity to commit the crimes any more than the simple fact of possession of incestuous pornography would show a defendant's propensity to commit statutory rape. However, evidence of a defendant's economic need or greed obviously sheds light on the defendant's potential desire to satisfy that need or greed, and that desire certainly serves as evidence of the defendant's motive to commit the underlying act—robbery, murder, kidnapping, felonious burning—constituting the offense charged. Likewise, evidence of a defendant's incestuous

pornography collection sheds light on that defendant's desire to engage in an incestuous relationship, and that desire serves as evidence of that defendant's motive to commit the underlying act—engaging in sexual intercourse with the victim/defendant's child—constituting the offense charged.

The crux of the analysis in all of these cases is whether the evidence is, in fact, relevant to the alleged motivating factor, *i.e.*, whether the desire for money can be inferred from a lack of money or the opportunity to gain money and whether the desire to engage in an incestuous relationship can be inferred from the possession of incestuous pornography. *See* N.C. Gen. Stat. § 8C-1, Rule 402 (2009) ("All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of North Carolina, by Act of Congress, by Act of the General Assembly or by these rules."); N.C. Gen. Stat. § 8C-1, Rule 401 (2009) (" 'Relevant evidence' means evidence having any tendency to make the existence of . any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). As the first is fairly obvious, it is only the second that is relevant in the present case.

It certainly seems reasonable to infer incestuous desire from one's possession of incestuous pornography. Without purporting to speak authoritatively on literary merit in the pornographic context, we find it logical to conclude that one's purpose in reading Family Letters, which can only euphemistically be characterized as "erotica," is not to enjoy the stylistic flourishes or intricate plot twists. Instead, it can be more reasonably inferred that the reader intends to gratify a sexual desire by reading the stories. Indeed, pornography, by at least one of its definitions, is "a portrayal of erotic behavior *designed to cause sexual excitement.*" *Miller v. California*, 413 U.S. 15, 18-19 n.2, 37 L. Ed. 2d 419, 427 n.2 (1973) (quoting Webster's Third New International Dictionary (Unabridged 1969)) (emphasis added); *see also* Webster's Third New International Dictionary (Unabridged 2002). Where the pornography possessed consists solely of incestuous encounters, there arises a strong inference that the possessor is sexually excited by at least the idea of, if not the act of, incestuous sexual relations. Accordingly, in this case, the fact of Brown's possession of incestuous pornography reasonably supports the inference that Brown was sexually desirous of an incestuous relationship.

Anticipating response to this line of reasoning, it may be argued that admitting evidence of possession of incestuous pornography in a

case involving incest could open the door for admission of possession of more innocuous-seeming literature in cases where that literature would appear to be relevant. As one panel of the Ninth Circuit Court of Appeals put it: "Woe, particularly, to the son accused of patricide or incest who has a copy of *Oedipus Rex* at his bedside." *Guam v. Shymanovitz*, 157 F.3d 1154, 1159 (9th Cir. 1998), *rev'd, United States v. Curtin*, 489 F.3d 935 (9th Cir. 2007). However, such argument, while superficially intriguing, is particularly overreactive and unpersuasive.

A comparison between possession of Family Letters and possession of *Oedipus Rex*, or any other literature with socio-deviant undertones, is akin to a comparison between possession of a sawed-off shotgun and possession of a Revolutionary War-era pistol. While possession of Family Letters or a sawed-off shotgun strongly supports one obvious inference—that the possessor is desirous of incestuous relationships or that the possessor is "up to no good," respectively, *cf. United States v. Hood*, 628 F.3d 669, 672 (4th Cir. 2010) (noting that "possession of a sawed-off shotgun is unique in that the weapon has no nonnefarious purposes")—possession of classic literature or a collectible firearm leads to a myriad of logical inferences about the possessor—that the possessor has an interest in classical Greek tragedy or Revolutionary War-era relics; that the possessor has an appreciation of irony or classic workmanship; that the possessor desires his potential partners to regard him as well-read or sophisticated—none of which necessarily lead to any conclusion about the possessor's potential patricidal, incestuous, or nefarious motivations. Pornography, especially such singularly specific pornography like Family Letters, provides an obvious inference about the sexual motivations of the possessor in a way that other reading material cannot. Obviously not all pornography provides as strong or obvious an inference as does the incestuous pornography in this case, but the strength, or probative value, of that inference is to be regarded in the balancing test of Rule 403 and does not necessarily require exclusion under Rule 404(b). *See* N.C. Gen. Stat. § 8C-1, Rule 403. In any event, the admissibility of pornography or reading material in general is not at issue in this case. The issue here is simply whether evidence of Brown's possession of incestuous pornography was properly admitted in the prosecution of Brown for his alleged sexual relations with his daughter. Because such evidence was relevant to establishing Brown's motive in engaging in the conduct constituting the underlying offense, we conclude that the trial court's admission of Family Letters was not error.

We further disagree with Brown's contention that the evidence of Family Letters was not relevant to establishing Brown's intent. Prior to beginning deliberations, the trial court instructed the jury on the charge of attempted first-degree rape.[5] Specifically, the court instructed the jury that to find Brown guilty on this charge, they would need to find "from the evidence beyond a reasonable doubt that on or about the alleged date, [Brown] *intended* to engage in vaginal intercourse with the victim." A person's intent "is seldom, if ever, susceptible of proof by direct evidence" and "must ordinarily be proven by circumstantial evidence . . . from which it may be inferred." *State v. Petry*, 226 N.C. 78, 80-81, 36 S.E.2d 653, 654 (1946). As discussed *supra*, Brown's desire to engage in incestuous sexual relations may reasonably be inferred from Brown's possession of the incestuous pornography. Further, assuming the jury found that "[Brown] performed an act or acts, which in the ordinary course of events would have resulted in vaginal intercourse by [Brown] with the victim had not [Brown] been stopped in some way from his apparent course of action," the jury could, from Brown's desire to engage in incestuous sexual relations, infer Brown's intent to engage in vaginal intercourse with his daughter, the victim in this case. Accordingly, we conclude that the evidence of Brown's possession of Family Letters was relevant to prove intent and that the trial court did not err in admitting the evidence for that purpose.

Finally, we conclude that the evidence of Brown's possession of Family Letters was also admissible as relevant evidence tending to establish the purpose of Brown's alleged actions with respect to the charged offense of indecent liberties with a minor. As stated by our Supreme Court, the list of permissible purposes for admission of other acts evidence under Rule 404(b) is not exclusive, and "such evidence is admissible as long as it is relevant to any fact or issue other than the defendant's propensity to commit the crime." *State v. Hipps*, 348 N.C. 377, 404, 501 S.E.2d 625, 641 (1998) (emphasis added), *cert. denied*, 525 U.S. 1180, 143 L. Ed. 2d 114 (1999).

In this case, Brown was charged with taking indecent liberties with a minor child in violation of N.C. Gen. Stat. § 14-202.1, which provides as follows:

A person is guilty of taking indecent liberties with children if, being 16 years of age or more and at least five years older than

5. Although Brown was only indicted on the charges of first-degree rape and taking indecent liberties with a child, based on the evidence presented at trial, the trial court submitted to the jury the lesser-included offense of attempted first-degree rape.

the child in question, he [] [w]illfully takes or attempts to take any immoral, improper, or indecent liberties with any child of either sex under the age of 16 years *for the purpose of arousing or gratifying sexual desire.*

N.C. Gen. Stat. § 14-202.1 (2007) (emphasis added). "The gravamen of the offense of taking indecent liberties under [section] 14-202.1(a)(1) is the defendant's purpose in undertaking the prohibited act." *State v. Beckham,* 145 N.C. App. 119, 122, 550 S.E.2d 231, 234 (2001) (citing *State v. Hartness,* 326 N.C. 561, 567, 391 S.E.2d 177, 180 (1990)). A defendant's purpose in performing an act, like intent, is a mental attitude and "is seldom provable by direct evidence and must ordinarily be proven by inference." *State v. Jones,* 89 N.C. App. 584, 598, 367 S.E.2d 139, 147 (1988), *overruled on other grounds, State v. Hinnant,* 351 N.C. 277, 523 S.E.2d 663 (2000) (internal quotation marks omitted). "As prior similar acts are admissible to show intent, so may they be admitted to show a defendant's purpose under [section] 14-202.1(a)(1)." *Beckham,* 145 N.C. App. at 122, 550 S.E.2d at 234.

As discussed *supra,* Brown's possession of Family Letters strongly supports the inference that Brown's "sexual desire" included incestuous relationships, and that Brown's desire was "gratified" or "aroused" by engaging in the conduct constituting the offense charged. Accordingly, Brown's possession of Family Letters provides clearly relevant evidence to satisfy the statutory requirement that Brown's conduct with the victim be for the purpose of arousing his sexual desire.[6]

Though we conclude that the evidence of Brown's possession of Family Letters was properly admitted under Rule 404(b) in that it was relevant to show Brown's motive, intent, and purpose, it must still be determined whether the evidence passes the Rule 403 balancing test, *viz.,* whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *State v. Summers,* 177 N.C. App. 691, 697, 629 S.E.2d 902, 907 ("Once the trial court deter-

---

6. Although we conclude that the evidence was properly admitted to show intent and motive, were the evidence only admissible to show purpose under section 14-202.1 (and assuming purpose under section 14-202.1 and motive under Rule 404(b) are not the same), the court's admission of the evidence for an improper purpose such as motive or intent would be non-prejudicial error based on its admissibility to show purpose. *See State v. Harris,* 140 N.C. App. 208, 212, 535 S.E.2d 614, 617 ("[B]ecause the evidence was admissible for a proper purpose (to show a common plan or scheme), the trial court's error in admitting that same evidence for an improper purpose (lack of consent) is rendered non-prejudicial."), *disc. review denied, appeal dismissed,* 353 N.C. 271, 546 S.E.2d 122 (2000).

mines evidence is properly admissible under Rule 404(b), it must still determine if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice under Rule 403." (internal quotation marks omitted)), *disc. review denied, appeal dismissed,* 360 N.C. 653, 637 S.E.2d 192 (2006); *see also* N.C. Gen. Stat. § 8C-1, Rule 403. This second determination "is within the sound discretion of the trial court, whose ruling will be reversed on appeal only when it is shown that the ruling was so arbitrary that it could not have resulted from a reasoned decision." *State v. Bidgood,* 144 N.C. App. 267, 272, 550 S.E.2d 198, 202, *cert. denied,* 354 N.C. 222, 554 S.E.2d 647 (2001).

Regarding the danger of unfair prejudice arising from admission of Family Letters, Brown notes that "[e]veryone at trial seemed to agree that the 'Family Letters' book was quite distasteful and even shocking" and that "[n]ot only did it include very specific stories of incestuous activities, but it also contained explicit pictures of such acts being performed." Brown contends that because the graphic and "shocking" book was "passed around the jury box for each juror to view," "[i]t is very likely that the book led the jury to convict Mr. Brown based on its disgust with his possession of such materials and on his character, not simply based on the evidence against him."

However, aside from Brown's own unsupported contention, there is nothing to show that the jury convicted Brown solely out of "disgust" for the content of Brown's pornography. As such, we must conclude that the jury's *potential* disapproval of Brown's possession of the pornography did not substantially outweigh the strong probative value of the evidence in showing Brown's motive, intent, and purpose with respect to the alleged conduct. Furthermore, when the trial court admitted Family Letters into evidence, the court issued a limiting instruction to the jury, stating that "[i]f you find the testimony about [Family Letters] to [be] credible, you may consider that only if you find that it bears upon [Brown's] motive or intent to commit the charged offenses and for no other purpose than that." As previously stated by this Court, "[t]he law presumes that the jury heeds limiting instructions that the trial judge gives regarding the evidence." *State v. Riley,* —— N.C. App. ——, ——, 688 S.E.2d 477, 480, *cert. denied,* 364 N.C. 246, 699 S.E.2d 644 (2010). Based on our review of the record, there is nothing to indicate that the jury ignored the trial court's limiting instruction and considered Family Letters as anything other than evidence of Brown's motive or intent in committing the alleged conduct. Accordingly, we conclude that the evidence of Brown's possession of Family Letters did not unfairly prejudice Brown and, therefore, was properly admitted by the trial court.

Furthermore, we are unpersuaded by Brown's argument that admission of "testimony about alleged sexual acts committed by [Brown] against [Sally's] sister [Jessica]" constituted plain error by the trial court and warranted reversal of the jury's convictions.

At trial, Alisea Pierce ("Pierce"), a community support case manager with Appalachian Community Services, and Mary Holliday ("Holliday"), a contract attorney with DSS, recounted conversations each had with Sally, in which Sally reported that Brown had sex with both Sally and her sister Jessica. Pierce testified that Sally reported that she, along with her sister, "were [dragged] into their father's bedroom with both parents present by their hair, were undressed, and he was undressed as well, that he had sex with her and then with her little sister." Holliday testified to a similar, but more detailed, account, in which Sally reported that Brown "dragged her by her hair to the bedroom," "took [Sally's] clothes off," and "did very, very bad stuff with her private parts and his private parts." Holliday then testified that Sally stated that Brown "started doing the same thing to the sister [Jessica]. [Sally] said she tried to push him off of [Jessica]. But he took [Jessica's] clothes off and did the same thing to her as he'd done to [Sally]." All of this testimony was admitted by the court without any objection from Brown.

On appeal, Brown contends that admission of this testimony was error because the testimony did not corroborate Sally's testimony and was, thus, inadmissible hearsay. Brown argues that any testimony as to what Brown may have done to Jessica contradicted Sally's testimony because Sally "merely testified that her sister was present when the incident with [Brown] occurred" and "never stated that [Brown] went anywhere near, touched, or did anything to [Jessica]." As Brown failed to object to the admission of the testimony by Pierce and Holliday, this Court may only review the alleged error for plain error. N.C. R. App. P. 10(a)(4).

As an initial matter, we note that, although the prior statements by Sally presented by Holliday and Pierce do not exactly mirror Sally's in-court testimony, "[i]n order to be admissible as corroborative evidence, the pre-trial statement of a witness need not merely relate facts brought out in the witness's testimony at trial." *State v. Kim*, 318 N.C. 614, 619, 350 S.E.2d 347, 350 (1986). Rather, "the corroborative testimony may contain new or additional information when it tends to strengthen and add credibility to the testimony which it corroborates." *State v. Howard*, 320 N.C. 718, 724, 360 S.E.2d 790, 793-94 (1987) (internal quotation marks and citations omitted).

In our view, although Sally testified only that her sister was present when Brown allegedly raped Sally, the evidence of Sally's prior statements regarding sexual acts committed against Sally's sister clearly does not contradict Sally's testimony. Instead, the additional information serves to "strengthen and add credibility to" Sally's version of the events by explaining and expanding upon Jessica's presence during the incident.

Nevertheless, to the extent the admission of the evidence regarding Brown's alleged sexual encounter with Sally's sister exceeded the scope of permissible corroboration, we conclude that the admission of such evidence did not amount to plain error warranting reversal of Brown's convictions.

As previously stated by our Supreme Court,

> [t]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a "fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has " 'resulted in a miscarriage of justice or in the denial to appellant of a fair trial' " or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings . . . ."

*State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (emphasis omitted) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir. 1982)). To show plain error, the defendant must convince the Court "not only that there was error, but that absent the error, the jury probably would have reached a different result." *State v. Allen*, 360 N.C. 297, 310, 626 S.E.2d 271, 282 (internal quotation marks omitted), *cert. denied*, 549 U.S. 867, 166 L. Ed. 2d 116 (2006).

In support of his argument that the erroneous admission of Pierce's and Holliday's testimony amounted to plain error, Brown presents the old plain error saw that "this case basically came down to a swearing contest" between Brown and Sally and asserts that the complained-of testimony "certainly had a profound impact on the jury's view of [Brown] and of the evidence against him."

First, it seems that if the jury believed Pierce's and Holliday's testimony (which we must assume it did, else the error could not have had any impact), the testimony's negative impact on "the jury's view"

of Brown could only have been slight, if not nonexistent, considering that, absent admission of that portion of the testimony, the jury would have viewed Brown as someone who had sex with only one daughter, but in the presence of the other daughter, instead of viewing Brown as someone who had sex with both of his daughters successively in the same room. Second, although Brown is correct that there was no scientific or physical evidence proving Brown committed the alleged acts, we cannot conclude, in the face of the remainder of Sally's amply-corroborated testimony and the evidence of Brown's motive and intent to commit the alleged acts, that the admission of two statements regarding reports by Sally that Brown also had sex with Sally's sister caused, or even probably caused, the jury to return the verdict that it did. Accordingly, we are not convinced that the admission of the portions of Pierce's and Holliday's testimony referring to Sally's report that Brown raped his other daughter was "fundamental error" that was "so prejudicial, so lacking in its elements that justice cannot have been done." We conclude that the admission of the complained-of testimony was not plain error and that Brown received a fair trial, free of prejudicial error.

## II. SBM Hearing

[2] Brown next argues that the trial court erroneously ordered him to enroll in lifetime SBM. We disagree.[7]

At the close of Brown's sentencing, the trial court stated that "this [conviction] is a reportable offense and that it is an aggravated offense and, therefore, [Brown] is subject to lifetime sex monitoring under the current statute when he gets out."[8] The trial court then issued a "judicial findings and order for sex offenders," in which the

7. Brown's oral notice of appeal in open court was insufficient to confer jurisdiction on this Court with respect to Brown's appeal of the SBM order. *See State v. Brooks*, —— N.C. App. ——, ——, 693 S.E.2d 204, 206 (2010) (holding that "oral notice pursuant to N.C. R. App. P. 4(a)(1) is insufficient to confer jurisdiction on this Court" in a case arising from a trial court's order requiring a defendant to enroll in SBM). However, Brown has petitioned this Court to issue a writ of *certiorari* to hear the merits of Brown's appeal of the SBM order. This Court may, in its discretion, issue a writ of *certiorari* "when the right to prosecute an appeal has been lost by failure to take timely action." N.C. R. App. P. 21(a)(1). Because the proper method of appeal from an SBM order was not entirely clear until 18 May 2010, when this court decided *Brooks*, and because Brown gave oral notice of appeal on 17 July 2009, we grant Brown's petition for writ of *certiorari*.

8. The trial court did not specify which offense was the aggravated offense, despite the fact that both offenses of conviction were reportable offenses. *See* N.C. Gen. Stat. § 14-208.6(4) (2009). However, the trial court found that Brown was convicted of "rape of a child, [section] 14-27.2A," which leads to the conclusion that the trial court was referring to Brown's first-degree rape conviction under section 14-27.2(a)(1).

court (1) found that Brown was "convicted of a reportable conviction under [section] 14-208.6, specifically . . . rape of a child, [section] 14-27.2A[;]" (2) found that the "offense(s) of conviction is an aggravated offense[;]" and (3) ordered that "upon release from imprisonment, [Brown shall] be enrolled in a satellite-based monitoring program . . . for his[] natural life."

On appeal, Brown argues that the trial court erred by finding that "the offense of conviction is an aggravated offense."[9] We are unpersuaded.

"[I]n order for a trial court to conclude that a conviction offense is an 'aggravated offense' . . . this Court has determined that the elements of the conviction offense must 'fit within' the statutory definition of 'aggravated offense.' " *State v. Phillips*, —— N.C. App. ——, ——, 691 S.E.2d 104, 106 (2010). Section 14-208.6(1a) defines "aggravated offense" as follows:

> any criminal offense that includes either of the following: (i) engaging in a sexual act involving vaginal, anal, or oral penetration with a victim of any age through the use of force or the threat of serious violence; or (ii) engaging in a sexual act involving vaginal, anal, or oral penetration with a victim who is less than 12 years old.

N.C. Gen. Stat. § 14-208.6(1a) (2009). In determining whether the conviction offense "fits within" the definition of "aggravated offense," this Court has held that the "trial court is only to consider the elements of the offense of which a defendant was convicted and is not to consider the underlying factual scenario giving rise to the conviction." *Phillips*, —— N.C. App. at ——, 691 S.E.2d at 106 (emphasis and internal quotation marks omitted).

In this case, the elements of the charged offenses—indecent liberties with a minor and first degree rape—do not "fit within" the second statutory definition of "aggravated offense" because obviously neither a child under the age of 16 years, nor a child under the age of 13 years, is necessarily also a child less than 12 years old "without looking at the underlying facts[.]" *Phillips*, —— N.C. App. at ——, 691 S.E.2d at 108; *see also* N.C. Gen. Stat. § 14-27.2 (2005) ("A person is guilty of rape in the first degree if the person engages in vaginal intercourse . . . [w]ith a victim who is a child under the age of 13 years and the defendant is at least 12 years old and is at least four years older than the vic-

---

9. To the extent Brown's argument is not properly preserved for appeal based on Brown's admitted failure to contest any of the findings by the trial court during the SBM proceeding, we suspend the North Carolina Rules of Appellate Procedure to address this issue and "prevent manifest injustice" to Brown. N.C. R. App. P. 2.

tim . . . ."); N.C. Gen. Stat. § 14-202.1 (2005) ("A person is guilty of taking indecent liberties with children if, being 16 years of age or more and at least five years older than the child in question, he [] [w]illfully takes or attempts to take any immoral, improper, or indecent liberties with any child of either sex under the age of 16 years for the purpose of arousing or gratifying sexual desire.").[10]

However, according to this Court's opinion in *State v. Clark*, — N.C. App. ——, —— S.E.2d —— (2011), because rape of a child under the age of 13 "necessarily involves 'the use of force or threat of serious violence,' " "the essential elements of first degree rape [of a child] 'fit within' the [first] statutory definition of an "aggravated offense." *Id.* —— at ——, S.E.2d at ——. Accordingly, we conclude that the trial court properly found that Brown was convicted of an aggravated offense such that enrollment in lifetime SBM was not error. Brown's argument is overruled.[11]

Based on the foregoing, we conclude that Brown received a fair trial, free of prejudicial error, and that the trial court did not err in ordering Brown to enroll in lifetime SBM.

---

10. Under the test created by this Court for application of section 14-208.6, there are no offenses that "fit within" the second definition of "aggravated offense," *i.e.*, an offense that includes "engaging in a sexual act involving vaginal, anal, or oral penetration with a victim who is less than 12 years old." Every sex offense in the General Statutes either (1) does not mention the victim's age, *see* N.C. Gen. Stat. §§ 14-27.3 (second-degree rape), 14-27.5 (second-degree sexual offense),14-27.5A (sexual battery) (2009) or (2) states the relevant age of the victim as something other than "less than 12 years old." *See* N.C. Gen. Stat. §§ 14-27.2(a)(1) (first-degree rape; "child under the age of 13 years"), 14-27.2A (rape of a child; adult offender; "child under the age of 13 years"), 14-27.4 (first-degree sexual offense; "child under the age of 13 years"), 14-27.4A (sexual offense with a child; adult offender; "child under the age of 13 years"), 14-27.7 (intercourse and sexual offenses with certain victims; "victim who is a minor" or "victim who is a student"), 14-27.7A (statutory rape or sexual offense of person who is 13, 14, or 15 years old) (2009). Accordingly, that portion of the statute delineating the second definition of "aggravated offense" has been rendered obsolete. *Compare Jolly v. Wright*, 300 N.C. 83, 86, 265 S.E.2d 135, 139 (1980) (stating that statutes are to be construed "so as to give effect to every provision, it being presumed that the Legislature did not intend any of the statute's provisions to be surplusage"); *see also Carlyle v. State Highway Comm'n.*, 193 N.C. 36, 47, 136 S.E. 612, 620 (1927) (in discussion of the rules of statutory construction, stating that "[a]bove all, it is not to be presumed that the Legislature intended any part of a statute to be inoperative and mere surplusage" (internal quotation marks omitted)).

11. As for Brown's remaining argument that enrollment in SBM violates his protections from *ex post facto* laws, such an argument is unavailing in light of our Supreme Court's decision in *State v. Bowditch*, 364 N.C. 335, 700 S.E.2d 1 (2010), which holds that subjecting a defendant to the SBM program does not violate the Ex Post Facto Clause of the state or federal constitution.

NO PREJUDICIAL ERROR at trial. SBM order AFFIRMED.

Judge STEELMAN concurs.

Judge HUNTER, ROBERT N., JR., dissents with a separate opinion.

HUNTER, JR., Robert N., Judge, dissenting.

The majority opinion conflicts with this Court's decisions in *State v. Smith*, 152 N.C. App. 514, 568 S.E.2d 289 (2002), and *State v. Bush*, 164 N.C. App. 254, 595 S.E.2d 715 (2004). However, if, as the majority contends, *Smith* and *Bush* do not create a bright line rule of exclusion under these facts, the majority's approach is still deficient for two reasons. First, the Family Letters publication's logical relevancy requires an impermissible character inference. Second, the unfair prejudice inherent in this evidence substantially outweighs the publication's probative value. Therefore, I must respectfully dissent.

In *Smith*, we held that "evidence of [the] defendant's possession of pornographic materials, without any evidence that [the] defendant had viewed the pornographic materials with the victim, or any evidence that [the] defendant had asked the victim to look at pornographic materials other than the victim's mere speculation" was irrelevant to establishing whether the defendant was guilty of first-degree sexual offense and taking indecent liberties with a minor. 152 N.C. App. at 523, 568 S.E.2d at 295. In *Bush*, we interpreted the holding in *Smith* to establish the following rule: "[T]he possession of [pornographic materials] is held *only* to show the defendant has the propensity to commit the offense for which he is charged and to be highly inflammatory." 164 N.C. App. at 262, 595 S.E.2d at 720 (emphasis added). Consequently, we explained, "the mere possession of pornographic materials does not meet the test of relevant evidence under Rule 401 of the North Carolina Rules of Evidence." *Id.* Our decision to find error in *Bush* was clearly premised on this expansive reading of *Smith*. *See id.* at 263, 595 S.E.2d at 721 ("We see no way around the facts and holdings in *Smith*, *Doisey* and *Maxwell* in attempting to apply Rule 404(b) to admit the evidence in question."). Therefore, we cannot disregard the articulation of the rule in *Bush* as mere *dicta*, and we are bound to apply it here. *See Trs. of Rowan Technical Coll. v. J. Hyatt Hammond Assocs., Inc.*, 313 N.C. 230, 242, 328 S.E.2d 274, 281 (1985) ("Language in an opinion not necessary to the decision is *obiter dictum* and later decisions are not bound thereby."); *In re Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989) ("Where a

panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court.").

The rule articulated in *Bush* makes no exception for pornography that is thematically similar to the crime charged. Therefore, I would hold the trial court erred in admitting evidence of the Family Letters publication. I would also hold that the error was sufficiently prejudicial to merit a new trial.

More importantly, assuming *arguendo Bush* and *Smith* did not create a bright line rule regarding the possession of all pornographic materials, the majority opinion would weaken a critical aspect of the character evidence rule, stripping our case law of a logical stopping point at which the rule comes into effect. North Carolina Rule of Evidence 404 contains the traditional character evidence rule: "Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion . . . ." N.C. R. Evid. 404(a). Subsection (b) provides a nonexclusive list of purposes for which uncharged conduct evidence may be offered without violating the character evidence rule. N.C. R. Evid. 404(b); *State v. Everhardt*, 96 N.C. App. 1, 17, 384 S.E.2d 562, 572 (1989), *aff'd*, 326 N.C. 777, 392 S.E.2d 391 (1990). Thus, Rule 404(b) is "a specialized rule of relevancy." *United States v. Moore*, 732 F.2d 983, 987 (D.C. Cir. 1984); *see also State v. Jeter*, 326 N.C. 457, 459, 389 S.E.2d 805, 807 (1990) ("[W]e have stressed repeatedly that the rule is, at bottom, one of relevancy."). Logic governs relevancy. If the evidence survives Rule 404, Rule 403 requires the trial court to exclude the evidence if the danger of unfair prejudice, among other things, substantially outweighs probative value. N.C. R. Evid. 403; *see also State v. Gibson*, 333 N.C. 29, 43, 424 S.E.2d 95, 103 (1992) (explaining that evidence not excluded by Rule 404 may still be excluded by Rule 403), *overruled on other grounds by State v. Lynch*, 334 N.C. 402, 410, 432 S.E.2d 349, 353 (1993).

The majority approach disregards a critical principle underlying the character evidence rule: uncharged conduct evidence may not be admitted unless "there is a rational chain of inferences that does not require an evaluation of character." David P. Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events* § 8.3, at 495 (2009); *accord* 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 4:28, at 746-47 (3d ed. 2007). In other words, the proponent must establish the evidence is *logically* relevant without

relying on a character inference. While Rule 404(b) contains a nonexclusive list of permissible purposes for which evidence may be offered, that evidence must be excluded if its logical link to one of those purposes requires a character inference. *See e.g.*, Mueller & Kirkpatrick, *supra*, § 4:28, at 746-47 ("[P]roof offered [of other bad acts] is not saved from the principle of exclusion by the mere fact that it supports a specific inference to a point like intent if the necessary logical steps include an inference of general character or propensity . . . ."); *United States v. Himelwright*, 42 F.3d 777, 782 (3d Cir. 1994) ("[W]hen evidence of prior bad acts is offered, the proponent must clearly articulate how that evidence fits into a chain of logical inferences, *no link of which may be the inference that the defendant has the propensity to commit the crime charged.*" (emphasis added)); *United States v. Commanche*, 577 F.3d 1261, 1267 (10th Cir. 2009) ("Because of the rule's structure, we do not read the permissible purposes demarcating the boundaries of 404(b)'s prohibition on propensity inferences as trumping the general proscription contained in the rule.").[12]

This part of the rule is critical. If a character inference can be used to connect evidence to a non-character purpose, the character evidence rule is effectively a dead letter because any number of character inferences about the defendant could be strung together to reach a "non-character purpose." A prosecutor cannot establish a proper purpose by merely mouthing the magic words "motive, opportunity, intent, preparation, plan, knowledge, identity" and so forth. He or she must articulate *how* the evidence is logically relevant to such a purpose without requiring a character inference.

Here, an impermissible character inference is necessary to establish the Family Letters publication's logical relevancy to Brown's motive or intent to commit the crimes charged. The following logical reasoning is required to establish motive: (1) Brown was in possession of a publication describing incestuous encounters in graphic detail; (2) Brown is the type of person who desires to engage in incest

---

12. *Accord, e.g.*, *United States v. Rubio-Estrada*, 857 F.2d 845, 846 (1st Cir. 1988) ("The result is a compromise. Where the past bad act is relevant *only* because it shows bad character (*i.e.*, the proposed logical inference includes character as a *necessary* link), Rule 404 *automatically* excludes the evidence."); *United States v. Desmarais*, 938 F.2d 347, 350 (1st Cir. 1991); *Masters v. People*, 58 P.3d 979, 996 (Colo. 2002); *State v. Hopson*, 735 So. 2d 81, 87 (La. Ct. App. 5th Cir. 1999); *People v. Crawford*, 582 N.W.2d 785, 794 (Mich. 1998); *State v. Fardan*, 773 N.W.2d 303, 326 (Minn. 2009); *State v. Clifford*, 121 P.3d 489, 498 (Mont. 2005); *State v. Bassett*, 659 A.2d 891, 896 (N.H. 1995); *State v. McGinnis*, 455 S.E.2d 516, 523 (W. Va. 1994).

because he reads graphic literature about incest; (3) Brown had a motive to engage in sex with his children: satisfying his incestuous desires; (4) Brown has a propensity to engage in sexual intercourse with relatives; and therefore, (5) the admission of the Family Letters publication tends to suggest Brown molested Sally.

Similar reasoning is required with respect to intent: (1) Brown was in possession of a publication describing incestuous sexual encounters in graphic detail; (2) Brown is the type of person who desires to engage in incestuous sex because he reads graphic literature about incest; (3) Brown intended to engage in sex with his children to satisfy his incestuous desires; and therefore, (4) the admission of the Family Letters publication tends to suggest Brown molested Sally.

In an attempt to justify this line of reasoning, the majority draws an analogy to several cases involving monetary gain as a motive. The majority contends that, if evidence of a desire for monetary gain is admissible to establish a defendant committed a crime to satisfy his monetary desire, then evidence of Brown's desire to engage in incest is admissible to prove Brown committed a crime to satisfy his sexual desire. Under this reasoning, *no* uncharged conduct reflecting on motive would be excluded by the character evidence rule. Evidence of a prior conviction for murder would be admissible in a murder trial because the prior conviction suggests the defendant is the type of person who *desires* to kill people—by killing the victim, the defendant was seeking to satisfy that desire. The same would be true for rape convictions in rape cases and larceny convictions in larceny cases.

But what distinguishes the forbidden use of motive evidence from the proper use of motive evidence? A moral judgment about the defendant. As the late Professor David Leonard explained,

> motive reasoning requires two steps. In the context of uncharged misconduct evidence, the first step is from the evidence to the existence of a motive, and the second is from the motive to action in conformity therewith. This looks very similar to character reasoning. How, then, does it differ? . . . The character rule is based on the deeply entrenched view that trials are conducted to determine what happened in the situation at issue and not to judge the morality of the parties. Because a person's "character" is driven by her morality, the law restricts evidence offered to prove character.

. . . .

... [T]he law assumes that motive is more specific than character, and its existence in a given situation does not depend on the person's morality. Under the right set of circumstances, even non-violent people can possess a motive to act violently, and honest people can have a motive to lie. ... We assume that a motive might exist because *any person* might possess one under those specific circumstances. The tendency to have such a motive is simply *human*; it does not derive from a trait of character specific to the person involved in the trial.

*Leonard, supra*, § 8.3, at 494-96 (footnotes omitted). Thus, "[a]ll character evidence offered to show action in conformity with character is propensity evidence, but not all propensity evidence is character evidence." Richard B. Kuhns, *The Propensity to Misunderstand the Character of Specific Acts Evidence*, 66 Iowa L. Rev. 777, 794 (1981). And a propensity inference is also a *character* inference if it involves a moral judgment about the defendant.

Monetary gain as motive to commit a violent crime does not *require* a moral judgment about the defendant. Rather, it can rely on the assumption that human beings are more likely than not to engage in conduct that will improve their financial circumstances. The defendant therefore has a motive to commit the crime, and no character inference is required to reach this conclusion. The existence of the motive makes it more likely than not that the defendant committed the crime.[13] *See* Leonard, *supra*, § 8.5.1, at 514-18 (explaining why evidence of uncharged misconduct suggesting motives of greed, a need for money, or the like do not run afoul of the character evidence rule).

The majority's analogy to monetary-gain-motive cases fails because the reasoning in those cases does not apply to a propensity to engage in depraved sexual misconduct. The Family Letters publication cannot be relevant to Brown's propensity to commit a sex offense without inferring he has a depraved sexual interest in incest. This is a *moral* judgment *specific* to Brown in contrast to the general, non-moral inference in monetary gain cases. As the majority explains, "[w]here the pornography possessed consists solely of incestuous encounters, there arises a strong inference that the possessor is sexually excited by at least the idea of, if not the act of, incestuous sexual encounters." Sometimes it can be very difficult to ascertain the

---

13. Whether this connection is probative *enough* in comparison to the suggestion that the defendant was motivated by greed because he is an evil person must be evaluated under the Rule 403 balancing test.

difference between permissible propensity evidence and impermissible character evidence—but not in this case. The publication is quintessential character evidence. *See, e.g., United States v. Curtin*, 489 F.3d 935, 963 (2007) (Kleinfeld, J., concurring) ("Using a person's perverse sexual fantasies to prove action in conformity therewith is exactly what subsection (a) of Rule 404 prohibits.").

The majority also maintains that, even if the Family Letters publication was inadmissible to establish Brown's motive and intent to commit first-degree sexual offense, it was admissible to establish the "purpose" element of the indecent liberties offense. To be guilty of the crime of taking indecent liberties, the defendant must engage in the prohibited conduct "for the purpose of arousing or gratifying sexual desire." N.C. Gen. Stat. § 14-202.1(a)(1) (2009). Establishing this purpose element is a "proper purpose" for offering evidence under Rule 404(b). *State v. Beckham*, 145 N.C. App. 119, 122, 550 S.E.2d 231, 234 (2001).

However, the trial court instructed the jurors to consider the Family Letters publication *only* if it bore on Brown's "motive or intent *to commit* the crime charged." There is no mention of considering the publication for the purpose of determining whether Brown possessed the requisite mental state for the purpose of indecent liberties. Based on this instruction, it is unlikely the jury would have used the publication to determine Brown's "purpose" within the meaning of the statute.

Moreover, this theory of logical relevancy *still requires a character inference*: (1) Brown was in possession of a publication containing descriptions of incestuous encounters in graphic detail; (2) Brown is the type of person who desires to engage in incest because he fantasizes about incest; and therefore, (3) his purpose in engaging in sexual activity with a family member was to gratify this sexual desire.

Brown's theory of the case was not that he engaged in sexual conduct with his daughters *without the purpose of arousing or gratifying sexual desire*. Rather, it was his contention at trial that the alleged conduct did not occur. Thus, the publication was not offered to explain why potentially innocent conduct was actually committed with the requisite mental state. Furthermore, under the majority's approach, the State would be able to evade the character evidence rule for general intent crimes, including most sexual offenses, by tacking on a specific intent offense, such as indecent liberties.

Even assuming there is some relevancy that does not require a character inference, the legitimate probative value of the publication

would be so minor that, when compared with the greater danger of unfair prejudice, admitting the evidence clearly fails the Rule 403 balancing test. When conducting this test, we consider two things to evaluate probative value: (1) the degree of similarity between the extrinsic conduct and the charged conduct and (2) the time elapsed between the incidents. *See State v. Frazier,* 344 N.C. 611, 615, 476 S.E.2d 297, 299 (1996); *State v. Boyd,* 321 N.C. 574, 577, 364 S.E.2d 118, 119 (1988) ("Nevertheless, the ultimate test for determining whether such evidence is admissible is whether the incidents are sufficiently similar and not so remote in time as to be more probative than prejudicial under the balancing test of N.C.G.S. § 8C-1, Rule 403."); Jeff Welty, UNC School of Government, *Special Evidentiary Issues in Sexual Assault Cases: The Rape Shield Law and Evidence of Prior Sexual Misconduct by the Defendant* 14 (2009), *available at* http://www.sog.unc.edu/pubs/electronicversions/pdfs/aojb0904.pdf ("Cases sometimes suggest that this analysis is required by Rule 404(b), but it is better understood as an application of the balancing test of Rule 403."). My review of the publication indicates the only similarity between the stories contained in the Family Letters publication and Brown's alleged conduct is their incestuous nature. None of the stories describing sexual encounters between parents and their offspring appear to involve young children, and none of the stories state the characters are below the age of consent. Regardless of the familial relationship involved, none of the stories involve a forced sexual encounter. Thus, the only commonality is incest—the publication has no probative value for the pedophilic and force aspects of the crimes charged. Furthermore, there was no testimony that Brown actually read Family Letters, and there was conflicting testimony as to whether Brown had ever *seen* the publication prior to its discovery by the police.

On the other hand, in admitting the evidence, there was a great danger of unfair prejudice. The publication contains numerous graphic descriptions of incestuous sexual activity between closely related family members. It describes encounters between parents and their children, between siblings, between grandparents and grandchildren, and so on. The stories are accompanied by graphic cartoon illustrations of the conduct described in the stories. The publication also contains advertisements for various sexual products, including a variety of "sex-toys" and numerous videos that purport to cater to what might be described by many as "bizarre" or "non-mainstream" sexual fetishes. Particularly in sex crime cases involving incest, this type of evidence is highly likely to inflame the passions of the jury

and cause jurors to assume the defendant committed the crime because he is a sexual deviant.

The majority's indecent-liberties-purpose theory not only suffers from low probative value, but using the publication to establish Brown's purpose is superfluous in light of the unfair prejudice. There was direct testimony from Sally that Brown forced her to perform oral sex. Evidence of the act itself is sufficient to establish Brown sought to gratify a sexual desire.

The trial court's limiting instruction was insufficient to mitigate the extreme danger of unfair prejudice. While there is a presumption "that the jury heeds limiting instructions that the trial judge gives regarding the evidence," *State v. Riley,* —— N.C. App. ——, ——, 688 S.E.2d 477, 480 (2010), it cannot be presumed that a limiting instruction is automatically sufficient to negate highly inflammatory evidence. Otherwise, we could discard the unfair prejudice component of Rule 403. Limiting instructions are particularly ineffective in uncharged conduct cases, where the jury is highly likely to consider evidence for an impermissible purpose and conclude the defendant should be convicted based on his bad character. *See, e.g., United States v. Daniels,* 770 F.2d 1111, 1118 (D.C. Cir. 1985) (stating that, when prior convictions are admitted, " 'the naive assumption that prejudicial effects can be overcome by instructions to jury' becomes more clearly than ever 'unmitigated fiction.' " (quoting *Krulewitch v. United States,* 336 U.S. 440, 453, 93 L. Ed. 790, 799 (1949) (Jackson, J., concurring))).

> Once prior bad acts of the accused are introduced in evidence and handed over to the jury for review, the realistic prosecutor, defense counsel, and trial judge know that the jury will use that bad character evidence to reason that the accused is a person of bad character or predisposition, and ought to be convicted of the present offense because of his prior history. The usual limiting instruction certainly makes the cold-type record look better to a reviewing court, but the efficacy of such an instruction has been questioned by professors and judges for decades. It is another example of repeating the same act and expecting different results.

Thomas J. Reed, *Admitting the Accused's Criminal History: The Trouble With Rule 404(b),* 78 Temp. L. Rev. 201, 250 (2005) (footnote omitted).[14] While the publication should have been excluded on char-

---

14. *See also* Sarah Tanford & Michele Cox, *The Effects of Impeachment Evidence and Limiting Instructions on Individual and Group Decision Making,* 12 Law & Hum. Behav. 477, 494 (1988) ("[T]he legal assumption that instructions reduce juror

acter evidence/relevancy grounds, even if there was some modicum of *legitimate* probative value, it was substantially outweighed by the danger of unfair prejudice.

In sum, the majority opinion contradicts our decisions in *Smith* and *Bush* and also fails to appreciate that uncharged conduct evidence cannot rely on a character inference to establish its logical relevancy. The trial court improperly admitted the Family Letters publication in violation of Rule 404. Furthermore, the danger of unfair prejudice posed by that evidence substantially outweighed its probative value inviolation of Rule 403. These errors constitute an abuse of discretion.

Several decisions note that our courts have been "markedly liberal" in admitting uncharged conduct in sex crime cases. *E.g., State v. Scott*, 331 N.C. 39, 52, 413 S.E.2d 787, 794 (1992). But a liberal trend of admissibility is not a rule of law. "Good prosecution proves that the defendant committed the crime. Bad prosecution proves that the defendant is so repulsive he ought to be convicted whether he committed it or not." *Curtin*, 489 F.3d at 963.

I dissent.

bias is false in many instances."); Roselle L. Wissler & Michael J. Saks, *On the Inefficacy of Limiting Instructions: When Jurors Use Prior Conviction Evidence to Decide on Guilt*, 9 Law & Hum. Behav. 37, 47 (1985) (concluding that "the presentation of the defendant's criminal record does not affect the defendant's credibility, but does increase the likelihood of conviction, and that a judge's limiting instructions do not appear to correct that error").